IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Case No. 1:20-CR-512

| UNITED STATES OF AMERICA<br><br>v.<br><br>BRADLEY CARL REIFLER | REPLY REGARDING (1) MOTION TO DISMISS WIRE FRAUD COUNTS (Counts 1-4) FOR FAILURE TO STATE AN OFFENSE AND FOR UNCONSTITUTIONAL VAGUENESS, ALTERNATIVE MOTION FOR BILL OF PARTICULARS, (2) MOTION TO DISMISS FOR DUPLICITY |
|---|---|

Without identifying a single false statement that Defendant Bradley Reifler made to North Carolina Mutual Life Insurance Company ("NCM") to obtain property, the government has charged Defendant with wire fraud for allegedly misappropriating the entity's funds. Instead of grappling with this fatal defect in the indictment and impermissible expansion of the wire fraud statute, the government cites several cases that address matters not at issue in Defendant's motion, such as whether a wire must be sent before property is fraudulently obtained. But none of the government's cases support the proposition that a wire fraud prosecution can proceed without the defendant ever making a false representation ***in furtherance of a scheme to obtain any property*** from the victim through fraud. Nor can such a prosecution proceed, as it would violate the fundamental rule that wire fraud only reaches "schemes for obtaining property." *Kelly v. United States*, 140 S. Ct. 1565, 1568 (2020). Because the indictment lacks sufficient allegations, the wire fraud counts should be dismissed.

Perhaps realizing these shortcomings, the government tries to rewrite the charges. In particular, the government's brief alleges lies that are nowhere to be found in the indictment and refers to purported fraud on an entity other than NCM. These attempts to salvage the indictment fail, as the government cannot substitute its pen for the grand jury's. The indictment cannot plausibly be construed as alleging that Defendant defrauded NCM to obtain property, and this defect is fatal. Properly construed, the indictment at best alleges that Defendant violated the purported agreement through which he obtained access to NCM's property. But the wire fraud statute was not designed to criminalize ordinary breaches of commercial contracts, and the indictment cannot sustain the charges.

## ARGUMENT

### *A. None of the government's cases negate the need to prove fraudulent activity to obtain property*

None of the cases in the government's opposition respond to the central defect noted in the motion to dismiss: the failure to allege that Defendant defrauded NCM to obtain access to the entity's funds. In the lead case cited by the government, which involved a mail fraud prosecution,[1] the defendant stole bingo money from a cash drawer and then submitted false information about the profitability of the bingo games to mask the theft. *United States v. Pierce*, 409 F.3d 228, 231 (4th Cir. 2005). Although the defendant had looted the cash drawer by the time the communications covering up the fraud were mailed,

[1] Defendant and the government agree that cases involving mail fraud are relevant to the interpretation of the wire fraud statute. Docket Entry ("D.E.") 25 at 13 n.2; D.E. 36 at 7 n.2.

the Fourth Circuit allowed the conviction to stand because the "Supreme Court has stated that 'mailings occurring after receipt of the goods ***obtained by fraud*** are within the statute if they were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'" *Id.* at 232 (quoting *United States v. Lane*, 474 U.S. 438, 451–52 (1986)) (emphasis added) (internal quotation marks omitted).

The bolded language makes clear that *Pierce* did not, as the government contends, reject the "very same argument" that Defendant is making. D.E. 36 at 9.[2] To the contrary, in *Pierce* the defendant obtained property through fraud, and the mailing at issue was part of that scheme. Here, however, the indictment does not allege any activity to obtain property by fraud, let alone that the wires in Counts 1-4 were part of such a scheme. Before any consideration can be given to a mailing or wire, the government first must demonstrate the existence of a scheme to fraudulently obtain property. *See Kelly*, 140 S. Ct. at 1568. It has not done so here.[3]

---

[2] In arguing that wire fraud prosecutions are not limited to cases where the wires predate the acquisition of property or are necessary to receiving the property, the government attacks a strawman. Although Defendant correctly noted that the wires in Counts 1-4 were sent long after Defendant allegedly obtained property, it is clear that Defendant's objection is that fraud to obtain NCM's funds is not alleged ***anywhere*** in the indictment.

[3] At a minimum, it is clear that Counts 3 and 4 are not part of the scheme because, by refusing to answer questions and making statements contradicted by earlier alleged representations, both of the communications would raise suspicions, and therefore cannot constitute the type of "lulling" communications that would continue a scheme (particularly one where the property was taken outside the limitations period). D.E. 25 at 16.

The remainder of the cases cited by the government all follow the same pattern. Specifically, the defendants first obtained property through fraud and later sent a mailing or a wire as part of that fraud to cover their tracks. *See United States v. Godwin*, 272 F.3d 659, 665 (4th Cir. 2001) ("The defendants ***obtained investments in part by falsely claiming*** that contracts and assets belonging to unrelated entities — Case Energy and Case Laboratories — were those of Case Oil Corporation.") (emphasis added); *Morley v. Cohen*, 888 F.2d 1006, 1008 (4th Cir. 1989) (investments obtained through an offering document that "***misrepresented*** the role of an engineering company in the operation") (emphasis added); *United States v. Snowden*, 770 F.2d 393, 398 (4th Cir. 1985) (the defendant altered a document to "swindle" a businessman, and a "portion of the money, ***thus obtained***, was paid out among the defendants") (emphasis added).[4]

In sum, there is no support for the premise that the government can prove wire fraud if the defendant obtains property in a non-fraudulent manner. Focusing on the need for the wires to be in furtherance of a scheme to obtain property through fraud is not an "arcane limitation" but instead is a necessary limiting principle to avoid untethering wire fraud prosecutions from their historical roots. *See United States ex rel. O'Donnell v. Countrywide*

---

[4] The non-binding cases the government cites fit the same mold. *See United States v. Bradshaw*, 282 F. App'x 264, 265 (4th Cir. 2008) (per curiam) (involving a "***fraudulent scheme to steal cash*** that had been seized as evidence") (emphasis added); *United States v. Hollnagel*, 955 F. Supp. 2d 830, 845 (N.D. Ill. 2013) (involving a "scheme to defraud through these various means ***to obtain funds for themselves***") (emphasis added); *United States v. Okun*, No. 3:08-CR-132, 2009 U.S. Dist. LEXIS 12421, at *18 (E.D. Va. Feb. 18, 2009) ("[T]he SSI identifies the scheme to defraud and the ***misrepresentations used to obtain property*** that form the core of the mail fraud indictment.") (emphasis added).

*Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016). Because the indictment does not honor this limitation, the wire fraud counts cannot survive.

*B. The government cannot rewrite the indictment or engage in bootstrapping*

Seeking to skirt the issue, the government uses its brief to redraft the indictment and add allegations not found by the grand jury. *See* D.E. 36 at 8 (arguing that "the defendant lied to obtain access to the life insurance company's trust assets (D.E. 1, ¶ 21), admitted that it was 'very wrong' to divert those assets (*id.* at ¶ 22), and lied again when he promised to invest those assets in 'eligible investments' (*id.* at ¶¶ 15-16, 23-25)"). This portrayal has both factual and legal flaws.

Factually, the indictment does not allege that Defendant "lied" about how the funds would be invested. Nowhere in paragraphs 15-16 or 23-25 of the indictment (or anywhere else in the document) is there a finding ***by the grand jury*** (as opposed to an after-the-fact characterization by the prosecutor) that Defendant lied to obtain NCM's funds. Instead, as discussed below, the government has at most alleged a breach of contract, which is insufficient for a wire fraud charge.

The government's reliance on paragraphs 21 and 22 is similarly unavailing. Indeed, the suggestion that Defendant "lied to obtain access" to the funds is a misleading attempt to meet the elements of wire fraud. These paragraphs do not allege any representations by Defendant to anyone. Moreover, these paragraphs relate to the government's allegations that Defendant misappropriated funds from a ***different entity*** (not NCM) to raise funds for the NCM deal. But Defendant is not charged with defrauding that other entity, and the

indictment does not allege any deception to NCM in connection with that raising of funds. Defendant's alleged admission in paragraph 22 that his conduct was "very wrong" relates to funds purportedly belonging to that other entity. In short, whether or not the indictment alleges that Defendant legitimately obtained his seed money has nothing to do with whether he lied to NCM to obtain its funds.

Legally, the government's attempt to redraft the indictment fares no better. Instead, it suffers from at least two flaws. In particular, it is inconsistent with due process, and it is an exercise in impermissible bootstrapping.

First, the very purpose of the constitutional and statutory requirements that a wire fraud indictment identify "what the false pretenses were" is to prevent the government from doing what it has attempted to do here. *See United States v. Nance*, 533 F.2d 699, 701 (D.C. Cir. 1976) ("[A]bsent [identification] in the indictment as to what the false pretenses were, the United States Attorney would have a free hand to insert the vital part of the indictment without reference to the grand jury. The law does not vest him with such authority."); *see also Russell v. United States*, 369 U.S. 749, 770 (1962) ("To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure.").

The government has not even attempted to explain, by reference to the words of the indictment, how the lies the government alleges in its brief form the basis of a scheme to defraud found in the indictment. And, of course, the minimal constitutional standards for

an indictment "require that the defendant . . . should be called to answer charges actually brought by the Grand Jury and not a prosecutor's interpretation of those charges." *United States v. Haas*, 583 F.2d 216, 219 (5th Cir. 1978).

Nor can the government circumvent these principles through reliance on *United States v. Holmes*, No. 5:18-cr-00258-EJD, 2020 WL 666563 (N.D. Cal. Feb. 11, 2020), the highly publicized case involving Theranos and its technology for drawing and testing blood. Though the government cites this case for the proposition that it "need not allege specific misstatements" to pass constitutional muster, D.E. 36 at 13, *Holmes* actually supports dismissal of the indictment in this case.

In *Holmes*, the indictment's explanation of the alleged scheme to defraud clearly identified the overarching lie the defendants were alleged to have utilized in the scheme. It states:

> Despite representing . . . that Theranos could provide accurate, fast, reliable, and cheap blood tests and test results, [the defendants] knew that Theranos's technology was, in fact, not capable of consistently producing accurate and reliable results.

*Holmes*, D.E. 39 (Superseding Indictment) at 6 ¶ 16 (N.D. Cal. Sept. 6, 2018). The indictment also identifies no fewer than nine specific false representations supporting this overarching theory of fraud. *Id*. at 4–6 ¶ 12(A)-(I). In stark contrast to the specificity of the indictment in *Holmes*, the instant indictment's explanation of the alleged scheme to defraud fails to identify a single representation by Defendant—much less a false representation—utilized to obtain the victim's property.

*Holmes* establishes that a wire fraud indictment need not go beyond a detailed description of the false representations to provide "the names of speaker(s) and the targets, dates, context, and verbatim wording of misstatements." *Holmes*, 2020 WL 666563, at *5. But Defendant has not argued that the Constitution requires wire fraud indictments to provide verbatim quotations. Rather, he argues, as stated in the first sentence of the Argument section of his motion, that "[t]he indictment is fatally defective for failure to identify ***any false representations*** made for the purpose of obtaining property." D.E. 25 at 4 (emphasis added). Nothing in the *Holmes* order supports a contrary conclusion.

Second, the government's allegations related to purported fraud against a party other than NCM cannot salvage the indictment. To the contrary, these allegations are a naked exercise in bootstrapping. *See, e.g.*, *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) ("[T]he intent must be to obtain money or property ***from the one who is deceived*** . . . .") (emphasis added); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp.*, 805 F. Supp. 1277, 1294 (D.S.C. 1992) ("This court finds that the better reasoned rule is to require a convergence of the identity of the injured and the deceived. That is, the person allegedly injured by the misrepresentations must be the person allegedly deceived by the misrepresentations."). Here, because the government alleges that NCM is the party that was deceived, any deception of another entity is irrelevant.

*C. The wire fraud statute does not criminalize breach of contract*

At best, the indictment alleges that Defendant, having obtained NCM's funds in a lawful manner, made false representations to assuage concerns regarding compliance of

the investments or to divert blame. *See* D.E. 1 at 10–11 ¶¶ 31, 33. Indeed, the government has not identified a single statement Defendant made to NCM before gaining access to the funds and instead points only to a contract with a reinsurance company that Defendant allegedly signed that had a schedule that in turn purportedly defined the term "Eligible Investments." *Id.* at 4 ¶ 15. But even taking as true the government's allegation that Defendant later violated that contract, the purpose of the wire fraud statute is not to criminalize "every breach of contract." *United States v. Vinyard*, 266 F.3d 320, 327 (4th Cir. 2001) (internal quotation marks omitted); *see also Bendfeldt v. Window World, Inc.*, No. 5:17-CV-39-GCM, 2017 WL 4274191, at *6 (W.D.N.C. Sept. 26, 2017) ("This simple breach-of-contract allegation is not sufficient to plead criminal wire or mail fraud. A contractual undertaking for future conduct does not constitute the basis for a claim of fraud in violation of the mail and wire fraud statutes."); *United States v. Keuylian*, 23 F. Supp. 3d 1126, 1128 (C.D. Cal. 2014) ("Without some affirmative act of deception, a failure to perform one's contractual duties does not amount to fraud.").

Perhaps the clearest example of the overreach inherent in the government's theory is *O'Donnell*, a case in which the Second Circuit reversed a $1.2 billion penalty under facts strikingly similar to this case because there was no evidence to demonstrate mail or wire fraud. Just as Mr. Reifler allegedly promised to pursue only "Eligible Investments," a financial institution in *O'Donnell* was contractually obligated to sell "Acceptable Investments[s]." *O'Donnell*, 822 F.3d at 653–54. Mirroring the allegations against Mr. Reifler, the government in *O'Donnell* maintained that the financial institution substituted

risky, low-quality investments in lieu of safe securities. *Id.* Although there was substantial evidence that the financial institution breached its contractual obligations by providing subprime mortgages instead of high-quality investments, there was no allegation that there was "fraudulent intent at the time of contract execution." *Id.* at 663–64. In overturning the penalty, the court held that "a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise ***at the time of contract execution***. Absent such proof, a subsequent breach of that promise—***even where willful and intentional***—cannot in itself transform the promise into a fraud." *Id.* at 662 (emphasis added).[5]

Strikingly, the indictment in this case is devoid of any allegation that Defendant signed the purported contract with an intent to breach it. Instead, the government only alleges execution (D.E. 1 at 4 ¶ 15) followed by breach (*id.* at 5 ¶ 16). Moreover, the indictment alleges that Defendant's company initially provided accurate information about the manner in which the funds were invested and that Defendant only began attempting to conceal the investments after being told that they did not meet the eligibility standards. *Id.* at 9 ¶ 27. The provision, post-execution of the alleged contract, of accurate information about the investments is wholly inconsistent with a fraudulent mindset "at the time of contract execution." *O'Donnell*, 822 F.3d at 662.

[5] Although *O'Donnell* is a civil case, the court interpreted the criminal wire fraud statute to determine whether there was proof of a predicate offense that would justify imposition of a penalty under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989. *Id.* at 652; *see also United States v. Caltabiano*, 871 F.3d 210, 218 (2d Cir. 2017) (criminal case applying *O'Donnell*).

*D. The wire fraud charges are also duplicitous*

Because there are no allegations that NCM's money was obtained through fraud, Counts 1 through 4 are also duplicitous because they seek to conflate the allegations about obtaining property (which lack any fraud allegation) with the later sending of allegedly inaccurate wires (which lack connection to obtaining property). This bootstrapping is improper. In response, the government again attacks a strawman, arguing that there need not be a wire "throughout the evolution of the fraudulent scheme." D.E. 36 at 15. Defendant does not assert that every stage of the scheme must involve a wire—he argues that wires forming criminal charges must be in furtherance of a fraudulent scheme to obtain property. Here, none were, and thus the later wires must comprise a separate scheme.

*E. In the alternative, the government should provide a bill of particulars*

In his motion, Defendant sought a bill of particulars that "specifically identifies each of the false statements that were presented to the grand jury to support the wire fraud charges, including the specific false statements that allegedly were made to obtain the property at issue." D.E. 25 at 16. The government does not respond to Defendant's request and therefore should be deemed to waive any opposition to it. Because the facts that the government seeks to supply through its own pleadings are plainly not facts found by the grand jury, a bill of particulars cannot save the defective indictment. But in the event the Court declines to dismiss the wire fraud charges, the government should be required to provide a bill of particulars.

**CONCLUSION**

At a minimum, a wire fraud indictment must allege a communication sent as part of a scheme to acquire property through fraud. The indictment in this case makes a number of allegations against Defendant, but fraudulently obtaining NCM's property is not among them. The Court should therefore dismiss the wire fraud counts.

Dated: August 27, 2021

CHESHIRE PARKER SCHNEIDER, PLLC

/s/ Elliot S. Abrams
Elliot S. Abrams
N.C. State Bar # 42639
P. O. Box 1029
Raleigh, NC 27602
(919) 833-3114 (TEL)
(919) 832-0739 (FAX)
elliot.abrams@cheshirepark.com
*Counsel for Bradley C. Reifler*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on the following by the CM/ECF system for the Middle District of North Carolina:

Meredith C. Ruggles
Meredith.Ruggles@usdoj.gov

This the 27th day of August, 2021.

/s/ Elliot S. Abrams
Elliot S. Abrams
CHESHIRE PARKER SCHNEIDER, PLLC