IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


UNITED STATES OF AMERICA      *  Case No. 1:20CR512-1
                              *
vs.                           *  Greensboro, North Carolina
                              *  October 7, 2021
BRADLEY CARL REIFLER,         *  9:30 a.m.
                              *
             Defendant.       *
*******************************

**EXPEDITED TRANSCRIPT OF MOTION HEARING/PRETRIAL CONFERENCE**
BEFORE THE HONORABLE CATHERINE C. EAGLES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          THOMAS J. TYNAN, ESQUIRE
                             MICHAEL P. MCCARTHY, ESQUIRE
                             U.S. Department of Justice
                             1400 New York Avenue, NW
                             Washington, DC 20530

                             FRANK J. CHUT, JR., ESQUIRE
                             Office of the United States Attorney
                             101 S. Edgeworth Street, 4th Floor
                             Greensboro, NC 27401

For the Defendant:           ELLIOT S. ABRAMS, ESQUIRE
                             Cheshire Parker Schneider, PLLC
                             133 Fayetteville Street, Suite 400
                             Raleigh, NC 27601

                             STEPHEN G. TOPETZES, ESQUIRE
                             THEODORE L. KORNOBIS, ESQUIRE
                             K&L GATES LLP
                             1601 K Street, NW
                             Washington, DC 20006

Court Reporter:              Lori Russell, RMR, CRR
                             P.O. Box 20593
                             Winston-Salem, NC 27120

Proceedings recorded by stenotype reporter.
Transcript produced by Computer-Aided Transcription.

1              **P R O C E E D I N G S**

2        (Defendant present.)

3             **MR. CHUT:**  Good morning, Your Honor.

4             **THE COURT:**  Good morning.  All right.  Hold on.

5        First, since this is the first hearing -- no, that's not

6   right.  I think I did at least see some of y'all earlier, but

7   it was a while ago.  So I'm going to have -- and not all of

8   you.  So I'm going to have everybody tell me who we have in the

9   courtroom.

10       We do have the telephone line open for people to call in

11  and listen to the audio since there was some indication some

12  folks on the defense team might like to do that, and it's

13  available to the Government.  I think I made it available to

14  the public if anybody wanted to listen.

15       So first if we can start at the prosecution table.

16            **MR. TYNAN:**  Good morning, Your Honor.  Tom Tynan,

17  Mr. Blake McCarthy, and Mr. Frank Chut on behalf of the United

18  States.

19            **THE COURT:**  Okay.  Thank you.

20       And here?

21            **MR. ABRAMS:**  Good morning, Your Honor.  Elliot Abrams

22  for Mr. Reifler.  To my left is Stephen Topetzes.  He is a

23  lawyer from K&L Gates.  Mr. Reifler is here with the blue tie.

24  I guess they both have blue ties.

25       Mr. Reifler, could you stand up, please.

1          **THE COURT:**  All right.  The black mask.  Thank you.

2  You can be seated.

3          **MR. ABRAMS:**  And then Ted Kornobis is in the red mask.

4  He's also a lawyer with K&L Gates and part of our defense team.

5          **THE COURT:**  All right.  Thank you.

6          **MR. ABRAMS:**  Thank you, Your Honor.

7          **THE COURT:**  Here is what I want to do about the

8  schedule.  We'll just jump right in in a minute.  We'll take a

9  midmorning break.  I have to leave at 12:30 for a lunch break,

10  and -- if we're not done, and I have all day set aside for

11  this, so we can take as long as y'all need.  Well, we have to

12  stop by five o'clock, but I can't imagine we're going to go

13  that long.  We're going to have to take a full hour and a half,

14  maybe even longer, lunch break today, and then we'll finish up.

15     I'll apologize in advance that I have my cell phone on

16  because I've got some stuff going on with my elderly mother,

17  and if any of you ever need kind of a similar accommodation,

18  you know, I'll try to be understanding about that.  I hope it

19  will not be disrupted.  I turned the volume off, and I'm hoping

20  I feel it vibrate if anything happens.  I don't expect to have

21  to interrupt the hearing, but I might have to, like, text

22  somebody.  So I apologize in advance.  If I do that, I'll just

23  stop because I won't try to do it while I'm listening to y'all

24  because -- I have many skills, and I often can do two things at

25  once, but that doesn't seem like I should do that.  I apologize

1    in advance.

2        But I did not want to put the hearing off because, you

3    know, we all had planned to be here today, and I'm ready for

4    the hearing.  So I'm just going to manage that in a different

5    way.

6        All right.  Introductions, schedule.  There we go.

7        The first thing -- first of all -- next of all, rather, the

8    clerk sent y'all some of my questions yesterday.  I wish I had

9    gotten them to you a little bit earlier, but I did get them to

10   you before the hearing, so -- you know, I could have just

11   sprung them on you.  I do have a few other questions, but since

12   I knew I was going to be asking those, I thought, okay, let me

13   just go ahead and tell them.  That doesn't mean they're the

14   most important things.  They're just the things, you know, I

15   know I want you to address.

16       And I sent you a revised agenda by email through the clerk.

17   You got those?

18            **MR. TYNAN:**  Yes, Your Honor.

19            **THE COURT:**  And Mr. Abrams?

20            **MR. ABRAMS:**  Yes, Your Honor.

21            **THE COURT:**  So the motion to suppress is moot.  I've

22   actually denied that already.  I appreciate y'all working that

23   out and removing my trying to figure out exactly what the

24   Defendant had a privacy interest in and such.

25       I propose to take up the motion to dismiss the wire fraud

1    counts.  You know, this is the motion at Docket 25.  I
2    appreciate there's some overlap between that and some of the
3    other motions.  It's okay for you to make reference to that.  I
4    don't want to really get into the other motions, but -- but
5    there is that.
6        And if you want, you know, whenever it's convenient for you
7    to address the specific questions, you know, I have, I'll just
8    rely on y'all to do it; and if you don't do it, I'll be asking
9    you about it.
10       And, you know, I'll just note, I'm a fairly concrete
11   person, not abstract.  So I tend to think about these things in
12   terms of the jury instructions; and that's kind of why I
13   invited y'all to talk to me about the elements of the offense
14   and how the defense argument on this plays into the jury
15   instructions, because I'm not completely clear about that.
16       And -- and then I know -- and I do not -- let me back up.
17   I do anticipate ruling from the bench on quite a lot of this,
18   subject to y'all raising something that I'm unable to give full
19   consideration to while we're talking.  Some of it, you know, I
20   might have to take under advisement, but I might be able to
21   rule on all of it from the bench because, you know, I come from
22   Superior Court, which Mr. Abrams and Mr. Chut know all about,
23   and we rule on stuff -- we did, and I assume they still do,
24   rule on all kinds of stuff.  Plus, you get a quicker decision
25   on things.

1    The last things, starting with discovery status through

2  really the motion to dismiss for pre-indictment delay, there's

3  kind of a lot of overlap, and things that -- I might need to

4  evaluate what you say on pre-indictment delay in order to deal

5  with the motion to continue, for example.

6    So I don't anticipate ruling as we go along.  I anticipate

7  ruling at the end on whatever I feel like I'm ready to rule on

8  at that point, but I do expect to get rid of a bunch of these

9  motions on that day -- at that time.

10    Okay.  Any questions before we get started?

11       **MR. TYNAN:**  No, Your Honor.  Thank you.

12       **MR. ABRAMS:**  No.  Thank you.

13       **THE COURT:**  Okay.  I'll hear from you on the motion to

14  dismiss the wire fraud counts for, basically, what I'm saying

15  is failure to state an offense.

16    Go ahead, Mr. Abrams.

17       **MR. ABRAMS:**  Thank you, Your Honor.

18    From our perspective, Your Honor, this is a relatively

19  simple question.  It boils down to whether the indictment

20  alleges a lie through which Mr. Reifler obtained the funds in

21  question, and we think that that comports entirely with the

22  jury instructions, which we think are also relatively

23  straightforward.

24       **THE COURT:**  So let me ask you this -- I'll just jump

25  right in -- if I have your money in trust and you gave it to me

1  and there were no misrepresentations and then I steal your

2  money and I do it by, you know, an email to, you know -- some

3  sort of wire thing is involved, you're saying that's not wire

4  fraud?

5        **MR. ABRAMS:**  No, Your Honor.  I think that that --

6        **THE COURT:**  No, you are?

7        **MR. ABRAMS:**  I think that is wire fraud.

8        **THE COURT:**  Okay.  Why is that not what we have here?

9        **MR. ABRAMS:**  It's not what we have here because

10 Mr. Reifler put the money into these investments without making

11 any representations.

12        **THE COURT:**  They allege in the indictment that he used

13 a bunch of it to pay business expenses, so don't I have to

14 accept that as true for purposes of your motion?

15        **MR. ABRAMS:**  So you -- everything in the indictment

16 certainly for the purpose of our motion has to be accepted as

17 true.

18        **THE COURT:**  Right.

19        **MR. ABRAMS:**   The indictment indicates that the money

20 was first put -- first, from our perspective, the indictment

21 indicates the money was first invested into the Forefront

22 company and that the Forefront company used it for its

23 expenses, which -- just like if I bought, for example,

24 Coca-Cola stock and Coca-Cola used those particular dollars to

25 pay its employees, as an investor in the stock I have no

1  complaint -- no valid complaint because when I invest in a
2  company, the company can do with my money what it wants, unless
3  there are specific restrictions on the way that the money is
4  spent, which did not exist here.

5      The question from our perspective -- it looks like what the
6  Government has said is investing the money in Mr. Reifler's
7  company, Forefront company, was an ineligible investment under
8  the guidelines set forth in the Investment Advisory Agreement.
9  So I think it's important to know, Your Honor, when we raised
10 this issue, the Government says, well --

11         THE COURT:  Can you -- okay.  Just direct me to where
12 in the indictment it says what you're saying, because I -- when
13 I read it, I didn't read it that way.  I thought I read it to
14 say he took the money and spent it for his own purposes.  I
15 mean, not all of it presumably.  I mean, I don't know.  They
16 went into rehabilitation, so I don't know exactly what
17 happened -- or at least it's alleged they did.

18         MR. ABRAMS:  Yes, Your Honor.  So looking for the
19 portion of the indictment -- I believe it's at paragraph --

20         THE COURT:  16 is where I'm looking --

21         MR. ABRAMS:  Okay.

22         THE COURT:  -- and it says Mr. Reifler misappropriated
23 the funds, using them for improper expenses such as repaying
24 other investors and paying overhead at Forefront.  The
25 indictment says he did that.  It doesn't say -- I mean, I don't

1    know what happened, but that's not for resolution today, right?

2         **MR. ABRAMS:**  Yes, Your Honor.

3         **THE COURT:**  So I apologize.  I interrupted you.  I

4    asked you to direct my attention, and then I directed your

5    attention.  So where would you direct my attention?

6         **MR. ABRAMS:**  So paragraph 27 of the indictment says

7    that "On or about June 26th, 2015, Employee A sent Individual A

8    an account statement reflecting a list of six investments,

9    including investments of $10 million in FIT and $10 million in

10   Forefront Partners."

11        **THE COURT:**  Uh-huh.

12        **MR. ABRAMS:**  And so -- it's always difficult to do

13   this in a vacuum, Your Honor, but the -- the indictment, we

14   think, is accurate in that respect; that the money that then is

15   allegedly subsequently used for what the Government says, and

16   the indictment indicates, are improper expenses happens after

17   this particular investment.

18        And so -- and we think it's noteworthy that when we raised

19   this issue, which we think is straight from the jury

20   instructions, that the Defendant has to -- the Government has

21   to prove that the Defendant devised a scheme to obtain money or

22   property by means of false representations or promises that

23   were material.  We said the indictment doesn't say any lie that

24   he told.

25        And the Government didn't come back and say, "Well, we're

1  alleging embezzlement," which I think is the theory Your Honor

2  has raised, you know, to obtain money, holding it in trust and

3  putting it to an improper use knowingly and improperly.  That

4  would -- embezzlement theory is a different theory than what

5  the Government has put forth in response to our motion to

6  dismiss -- in response to our motion where we say there's no

7  lie.  We don't know what lie we're supposed to be responding

8  to.

9      The Government says that there are two lies alleged in the

10  indictment.  Number one, they say that he stole the money from

11  a third party that allowed him to obtain access to these funds,

12  which is a theory that we're -- I'll refer to as the stolen

13  funds theory; and then they -- and this is at pages 4 and 8 of

14  docket entry 36, which is their response to our motion to

15  dismiss.

16      The second theory that they raise, Your Honor, is that

17  Mr. Reifler made a false promise when he signed the Investment

18  Advisory Agreement, which is the contract that contains these

19  specific restrictions -- additional restrictions over and above

20  the statutory restrictions about how the funds can be spent.

21      That we think is -- they're saying these two theories.

22  They're saying he did lie; the indictment says he lied.  Number

23  one, he lied because he stole money from a third party that he

24  then used to obtain access, and then they say that he -- that

25  he made a false promise when he signed the Investment Advisory

1  Agreement where he said -- where they say the indictment

2  reflects that he said, "I promise I'm going to invest only in

3  these particular types of assets," and he subsequently did

4  something different.

5      **THE COURT:**  Are you saying that the Government has to

6  prove an actual lie -- I'll just use that word -- words coming

7  out of Mr. Reifler's mouth or keyboard that are untrue --

8  intentionally untrue and designed to mislead, whatever, as

9  opposed to circumstantial -- you know, this is a fiduciary

10 situation, and I just am wondering how that plays into it.

11     Plus, if you look at the bingo case, which that's what I've

12 been calling it, *Pierce,* you know, those folks took money from

13 third parties, the bingo players, and they put it in the cash

14 drawer.  They had authority from whatever the nonprofit was to

15 take -- to do this, but the problem was they didn't then turn

16 it over to the nonprofit.  They kept it.

17     Isn't that what he did?  I mean, he got the money law -- or

18 is alleged to have did it.  That's what I mean when I say he

19 did it.  You know, he gets the money lawfully, and then he --

20 you know, he spends it.  And in *Pierce*, the misrepresentation

21 was after that, just like you say is alleged here.  So why is

22 *Pierce* not controlling?

23     **MR. ABRAMS:**  So, Your Honor, *Pierce* -- we don't

24 believe *Pierce* is controlling because *Pierce* was a very

25 specific, limited issue that the appellant in that case

1  challenged.  It -- in *Pierce*, the defendant challenged his
2  conviction solely on the ground that he never caused the United
3  States mail to be used in furtherance of a scheme.  So the only
4  thing at issue in *Pierce* is did the Government prove that the
5  mailings -- that he caused in -- the mailings in furtherance of
6  a scheme.

7          **THE COURT:**  So you're saying everything else is dicta?

8          **MR. ABRAMS:**  Yes, Your Honor.  And it's right at the
9  beginning where the judge wrote:  "Pierce challenged his
10 conviction solely on the ground that he never caused the United
11 States mails to be used in furtherance of the fraudulent
12 scheme."

13      We have challenged a separate issue, and that is -- we're
14 saying there is no wire fraud scheme at all, so there is
15 nothing to be heard.  The reason that there's no wire fraud
16 scheme is that there is no lie.

17      To respond to Your Honor's question, you can -- you don't
18 have to say out loud or put in writing "I am going to do this
19 thing."  And, you know, it can be implied, but what it cannot
20 be, which is what we think we have here for the relevant
21 theory, is it cannot be just a contract and breach.  What we
22 have and what's alleged in the indictment is just a contract
23 and a subsequent breach.  What's missing is an allegation by
24 the grand jury that they found that he signed that contract and
25 made the promise with an intention to breach it.

1    **THE COURT:**  Okay.  But what about if he didn't?  You

2  know, he takes the money; he's planning to do things right.

3  Then he says, "Gee, I've got a Ponzi scheme going here by" -- I

4  don't know what's happened, but for whatever reason.  "I've got

5  to pay my mortgage."  I don't know, whatever -- and he says, "I

6  think here's a pot of money.  I can take money from this.

7  Nobody will ever know."  "I'll repay it," he says to himself,

8  because that's what people usually tell me they say to

9  themselves when they do that kind of thing.  You know, I'm not

10  saying he did that.  But, you know, he says, "Okay.  I'm going

11  to steal the money."  Basically, we're talking about stealing

12  money.

13      And so isn't -- how can that not be a scheme to defraud

14  and -- if he steals the money and he sends reports saying he

15  hasn't stolen the money, how is that not a misrepresentation?

16    **MR. ABRAMS:**  So from our perspective, you have to --

17  the theft -- just outright theft is distinct from wire fraud.

18    **THE COURT:**  Well, right.  But you -- you have to have

19  a scheme to defraud.  The wire does not have to include a

20  misrepresentation, right?

21    **MR. ABRAMS:**  We agree.

22    **THE COURT:**  Okay.  So if you've got a scheme to

23  defraud and in furtherance of it you send an email --

24    **MR. ABRAMS:**  And what we're -- we believe and we think

25  the case law supports is that there has to be a lie that the

1  grand jury alleges that's in the indictment.  There has to be a
2  lie through which the Defendant obtained the funds, and then --
3  and that that's what's missing here.
4            **THE COURT:**  Well, what --
5            **MR. ABRAMS:**  The --
6            **THE COURT:**  I'm not -- okay.  Thank you for clarifying
7  that.
8       But where is your support for that?  I mean, I don't see
9  that -- *Kelly* is totally -- I mean, first of all, it's talking
10 about property.  It's not talking about money.  Isn't it a lie
11 to send money to people it doesn't belong to as if it belonged
12 to you?  Are you saying the misrepresentation has to be to the
13 victim, here the insurance company?
14           **MR. ABRAMS:**  From our perspective, based on the
15 *Loughrin* case, which we submitted this week, the lie eventually
16 has to reach the victim; and this coming from the statutory
17 text which says that the money has to be obtained by means of a
18 false representation, promise, et cetera.  The Supreme Court in
19 *Loughrin* in 2014 -- I think it's Justice Kagan -- says you
20 can't obtain something by means of a lie unless the lie reaches
21 the victim.
22      And then they provide what I think is a very helpful
23 example, Your Honor.  They say if a person sells a fake Louis
24 Vuitton handbag representing it to be real and obtains a check,
25 and then takes that check and gives it to a bank, that the

1  person has not defrauded the bank.  There is certainly a lie

2  and the obtaining of money, but what's missing is the

3  connection between the lie inducing the victim to part with the

4  money.  And so that's --

5       **THE COURT:**  But how does that work here where he has

6  lawful control of the money?  It's not that he obtained

7  lawful -- I mean, maybe he did.  I'll hear from the Government

8  more about their theory.  But let's just assume that you're

9  right and that what it says is he -- you know, he obtained it

10  without any sort of lie or misrepresentation.  But when he

11  spends it, in other words, when he steals it -- because he has

12  it -- I don't understand why it's not an embezzlement-type

13  case.  I mean, that's what it sounds like to me.

14       **MR. ABRAMS:**  It's -- I think it's not, number one,

15  because that's not what the grand jury alleged.  They don't

16  allege he obtained the funds in the first instance, at least

17  based on our reading of the indictment and informed by the

18  Government's response here, that -- the indictment doesn't say

19  he obtained the money and then knowingly put it into things he

20  couldn't put it into after he obtained it.  They don't allege

21  an embezzlement theory.  We raised that --

22       **THE COURT:**  That's exactly what they say, isn't it?

23       **MR. ABRAMS:**  When we raised this issue, they say he --

24  he made a false promise -- he made a false promise when he

25  signed the contract saying that he would only invest in certain

1 limited things.

2      And it's important kind of to add a little context here.

3 The statute at issue, Your Honor, is really fraud.  It

4 basically says you can invest in any company, and so --

5           **THE COURT:**  The statute?

6           **MR. ABRAMS:**  The statute that controls how insurance

7 money can be invested.

8           **THE COURT:**  Oh.  Okay.

9           **MR. ABRAMS:**  I think that's important, because this is

10 not a situation in which it would just be so obvious to any

11 person on the street that you can't -- like, if the money had

12 been taken and put into a beach house or put into his pocket.

13           **THE COURT:**  Well, that's what they say he did.

14           **MR. ABRAMS:**  What they say he did is he took the

15 money, and he invested it in his own company and then used the

16 money for expenses within his own company.  And this is not a

17 case where we have money going into a beach house, money going

18 into vehicles.  It's a case where we have --

19           **THE COURT:**  Okay.  I mean, I hear what you're saying.

20 I don't see that in the indictment.  I mean, the indictment

21 says he used the money to repay other investors.  That's what

22 it says.  I mean, that's the equivalent of buying a beach

23 house.  That says "I took your money and I used it to satisfy

24 my debts.  I took your money, and I used it to satisfy my

25 company's debts."  That's what they allege.

1    Now, if we get to trial and the proof is, as you say -- I

2  mean, I don't know the answer to that.  But I have to go off of

3  what the indictment says.

4        **MR. ABRAMS:**  Absolutely.  And the indictment discusses

5  the investment of this money first.  It talks about -- this is

6  paragraph 27 -- on June 26, 2015, he invested it.

7        **THE COURT:**  But I'm looking at paragraph 16.  You

8  can't just only look at one part, right?  You have to read the

9  indictment as a whole.

10       **MR. ABRAMS:**  We agree, and I think that's why I'm

11 focused on the more specific paragraph.  You know, when we read

12 the search warrant affidavit, I think it's undisputed what

13 everybody knows happened here.

14       **THE COURT:**  Well, y'all know what happened, I guess,

15 because I only know what's in the indictment.

16       **MR. ABRAMS:**  And I think this is reflected in the

17 indictment, that the money was put into what the Government

18 says is an improper investment.

19       **THE COURT:**  Right, they definitely say that, but they

20 say other things too.

21       **MR. ABRAMS:**  Subsequent -- I think this is a very

22 important discussion to be had, because if the Government is

23 saying that what they're going to prove is he took the money

24 from NCM's bank account and put it straight into -- used it

25 straight to repay investors and it never went to the Forefront

1  company first -- if that's what they're required to prove, we
2  would accept that.  I mean, you know, if they file a Bill of
3  Particulars, for example, that limits them to having to prove
4  that the money -- that it did not actually got to the Forefront
5  company first, then, you know -- I don't know.  I don't think
6  the Government would put themselves in that position.

7        **THE COURT:**  Right.  Well, let me ask you -- I don't
8  know.  I'm just thinking, like, about most cases.  I don't
9  know -- I'm not an expert in wire fraud, but usually you have
10 lots of indicia of fraud.  So something that might not appear
11 to be fraudulent, like, from your perspective, invested it in
12 Forefront by itself, if that's not fraudulent -- okay.  Let's
13 assume that.  But if you've got all kinds of other indicia of
14 fraud, then why can you not find that to be fraudulent?

15      I mean, they alleged a bunch of stuff in here about his
16 motives and his actions and what he did all around this time,
17 including, you know, destroying documents.  That's a pretty big
18 indicia of fraud.  Why is that -- I mean, don't you look at the
19 entire situation rather than just a single moment in time,
20 excluding -- I mean, all of that other stuff shows his intent
21 to defraud, and exactly how he did it is up to the jury to
22 decide.  If they find he intended -- you know, it's up to them
23 to decide his intent and whether it's a scheme to defraud.  I
24 guess I'm having trouble understanding.

25        **MR. ABRAMS:**  Yes, Your Honor.  I think if I can kind

1  of walk through it from our –– as linearly as I can.  Starting

2  with *Kelly*'s requirement, it says you have to have a scheme to

3  obtain property, that that's got to be the focus.

4            **THE COURT:**  Or money.

5            **MR. ABRAMS:**  Money or property, yeah, which is –– from

6  our perspective, statutorily it's the same.

7            **THE COURT:**  And here they've clearly alleged that.

8  They've clearly alleged a scheme to obtain the trust funds and

9  use them for his own reasons, not for the benefit of the

10 insurance company, right?  I mean, don't you –– they say that

11 in the indictment, like, 20 times.

12           **MR. ABRAMS:**  They use conclusory statements like he

13 fraudulently misappropriated.  That's what's in there.  But

14 what's not in there is what is the underlying lie that makes

15 this a fraud.  That's what we think is missing.  Fraud is not a

16 thing in and of itself.  Fraud is a lie told to obtain money

17 from a victim.

18           **THE COURT:**  Well, I don't know, but generally breach

19 of fiduciary duty often –– just, you know, common law, that's

20 fraud.  You –– in the civil world, we treat that as fraud all

21 the time.  If you have a fiduciary duty to maintain somebody's

22 money and you steal it, why is that not fraud?

23           **MR. ABRAMS:**  I agree it does, Your Honor, but the word

24 "fiduciary" is nowhere in the indictment.  That's just not the

25 theory the grand jury found, and what we're here saying ––

1          **THE COURT:**  Trust funds?

2          **MR. ABRAMS:**  It's the title, so --

3          **THE COURT:**  He was holding the money, right?  He had

4     access to the money because he was the investment advisor, and

5     he -- right?  They do say this, I think:  He could invest it;

6     he had that authority; and he didn't require anybody's

7     approval.  Whether you call it fiduciary or not, how could that

8     not be a fiduciary relationship.

9          **MR. ABRAMS:**  So I think that if they had said that he

10    was the trustee of the funds and he knowingly embezzled the

11    funds, that -- from our perspective, this turns on what the

12    Government says their case is about.  When we raised this, they

13    didn't come up with this theory, and so what that says to us is

14    we are speculating about what the grand jury found, and that's

15    the heart of the problem here.  We're not saying that with the

16    facts that are in here there couldn't be -- you know, the grand

17    jury could never have found the critical thing.  You know, they

18    could find that he took the money as a fiduciary and knowingly

19    misappropriated it.

20         **THE COURT:**  That's what they say in the indictment, so

21    how -- I mean, right there, paragraph 16, that's what it says.

22    He invested trust assets by misappropriating them, using them

23    for improper expenses, such as repaying other investors and

24    paying overhead.  So, I mean, put aside the self-dealing,

25    the -- you know, just right there, why is that -- I'm just not

1  getting why that -- again, I don't know what the evidence is

2  going to be, but at this point I don't get into that.

3        **MR. ABRAMS:**  I think that's right, Your Honor, that if

4  the Government is staking itself out -- and I think it hasn't

5  done it for a reason.  They haven't said that he did the

6  classic embezzlement of taking the trust assets and putting

7  them directly into a, you know, ineligible -- into an

8  investor's pocket.  This is a situation where the purpose of

9  these funds is to invest, and the Government cannot contest

10 that the funds were invested in Forefront and then

11 subsequently -- and if -- and so I think what's important here

12 is that we have to know what we're defending against.

13    If the Government had responded to our motion and said,

14 "Our theory is that he had access to the trust funds, and he

15 reached into these trust funds, took them out and handed them

16 to investors and paid expenses directly," well, that would be

17 an embezzlement.  But what we have here is he took the money,

18 invested it.

19        **THE COURT:**  Well, it's hard to call it an investment

20 when you put it into Forefront and you intend to not actually

21 benefit the insurance company; you just intend to pay your own

22 bills.

23        **MR. ABRAMS:**  When you put it into Forefront, it's kind

24 of like a promissory note, where Forefront is committing to

25 paying a return on the money.  So putting it into Forefront

1  isn't an investment.  It's called that in the indictment, the

2  search warrant application.

3      And so the question -- and I think this is -- I'm guessing

4  for the Government, but this is why -- this is a strange case,

5  from our perspective, and why we filed this motion, because

6  it's not a typical wire fraud situation.  It's not a situation

7  in which you have someone saying, "I'm going to do X with the

8  money," and I do Y.  And the Government -- the grand jury

9  finding he promised that he was going to do Y or do X at the

10 time he promised that, he knowingly misrepresented that -- the

11 grand jury didn't find that.  What they found is he breached a

12 contract, and the -- this is very important because as the --

13      THE COURT:  How is stealing not more than breaching a

14 contract?

15      MR. ABRAMS:  That's -- stealing is certainly more than

16 breaching a contract.

17      THE COURT:  Okay.  If you steal directly, it's more;

18 and if you do it indirectly, it's more.

19      MR. ABRAMS:  Well, it -- the difference here is that

20 the purpose of the money was to be invested.  That's what it

21 exists for, is to earn a return.  The money was invested in

22 Forefront.  The indictment says that, and so that overrides --

23      THE COURT:  So if you invested it by giving it to

24 somebody involved in illegal gambling to whom you happen to owe

25 a zillion dollars, but you called it an investment, but really

1  it just paid off your gambling debt -- I mean -- but you called
2  it an investment, how is -- I mean, I don't understand how it
3  is not a scheme to defraud if that's what they can prove; that
4  he went into it to get X money for his own benefit and take it
5  away from the insurance company, use it for his own purposes as
6  opposed to their purposes.  I'm just having some trouble with
7  that.  I mean, yeah, there's all these ins and outs, but when
8  it boils down to it, isn't that what they say he did?

9        **MR. ABRAMS:**  They certainly say he tried to benefit,
10  but so does -- I mean, everybody involved in a contract is
11  trying to benefit.

12            **THE COURT:**  Well, sure.

13        **MR. ABRAMS:**  And so -- but the heart of the issue is
14  how do we separate this from a traditional breach of contract.
15  That's the heart of the issue, because it is a breach of
16  contract.  They've alleged that.  They've alleged a contract,
17  and they've alleged breach.  But to turn a breach of contract
18  into a fraud, there has to be a clear allegation that you
19  entered into the contract intending not to comply with the
20  obligations that you're making.  That's the difference.
21  Otherwise, every breach of contract would be a wire fraud if it
22  involved any wire.

23     And so -- and the reason that this is -- and I understand,
24  Your Honor, that ultimately they're saying he got a benefit out
25  of it, and they're saying it's a self-dealing investment.

1   Those things are clearly alleged in here.  But the

2   restrictions -- the money is intended to be invested.  The

3   money was invested, and so if what the Government is saying is

4   this -- you know, that this was not a real investment --

5           **THE COURT:**  Well, if the jury agrees with you that it

6   was a real investment, if that's what you're saying, then you

7   win, and he's found not guilty, right?  But if the jury says

8   this was not a real investment and he went into it for his own

9   benefit, then -- I mean, how is that not a scheme to defraud?

10          **MR. ABRAMS:**  I think if it was alleged at the outset

11  in the indictment, it was -- you know, what we've done here is

12  the indictment says a lot of facts that sound bad.  That's the

13  purpose of a speaking indictment, is to sound bad.  Now we're

14  trying to figure out what did they really mean, what facts did

15  the grand jury find supported these charges.

16          **THE COURT:**  Well, you're imposing some test that I'm

17  unfamiliar with.

18          **MR. ABRAMS:**  Where we get the test, Your Honor, is

19  from -- I think it's the -- it's *Nance*.  There's a number of

20  cases that we cited in our briefing, which I can cite to you,

21  that say if the case is built on a misrepresentation theory,

22  the indictment has to identify the misrepresentation; and from

23  our -- from our reading of the Government's response, they

24  don't contest that.

25          **THE COURT:**  Okay.  Well, that's a different argument

1  than what you've been talking about, right, or is it the same?

2        **MR. ABRAMS:**  So when -- when we -- coming in here

3  today, we -- this is our perspective.  We said in our original

4  filing, 25, the indictment has to allege a lie through which he

5  obtained the funds, and it doesn't, from our perspective.  The

6  Government responded it did -- the indictment does allege a

7  lie, and they say paragraph 21 alleges a lie and paragraphs 23,

8  24, and 25 allege a lie.  And so we think, you know, that this

9  is a relatively simple issue the way it's framed -- the way it

10  was framed.

11     Is the Government right?  When you look at paragraphs 21,

12  23, 24, and 25, is there a lie alleged in those paragraphs?  We

13  think the answer to that is, no, there's not a lie alleged in

14  21; and if there is, that it's not relevant because of the

15  *Loughrin* case.  And I'm happy to get into that.  But I think

16  that is the -- what we understood to be the dispute, basically.

17  And just reading those four paragraphs, does the grand jury

18  allege the lies that the Government has said are alleged?

19        **THE COURT:**  Are you saying that the misrepresentation

20  has to occur before or contemporaneous with the -- I'm just

21  going to say "stealing" because, you know --

22        **MR. ABRAMS:**  Yes.

23        **THE COURT:**  -- that's the way I think about it.  He

24  was either stealing or he wasn't, you know, before or

25  contemporaneous with?

1    **MR. ABRAMS:**  Yes, Your Honor.

2    **THE COURT:**  Even if at the time he takes it he is

3 intending to steal it and he has access to it lawfully but not

4 lawfully to do with it what he intends to do with it and then,

5 just during the course of the entire scheme, he starts lying

6 about it, that's not -- and sends some wires, that's not wire

7 fraud?  Is that your position; that if he makes a

8 misrepresentation 10 seconds after he steals the money, that's

9 no good?

10    **MR. ABRAMS:**  The short answer is yes.  I think that

11 the misrepresent -- you can't obtain something by means of a

12 lie if you obtain it and then later lie about it; and the

13 *Loughrin* case makes it clear, the statutory text makes it clear

14 that the lie has to be the mechanism through which you obtain

15 the funds.

16    And so, you know, what we -- from our perspective, what

17 happened here was the Government said, "We have a lie happening

18 after the fact and we have a taking before the fact."  And we

19 say that's backwards, and so I think Your Honor has hit the

20 nail on the head with that in terms of what -- the legal

21 dispute that we think exists here is that the lie has to be the

22 means by which you obtain the funds.  It can't be the fact that

23 you obtain funds and then later lie and that somehow they get

24 joined to turn into a scheme to defraud.

25    **THE COURT:**  When you have somebody's money lawfully to

1  do certain things with, limited by law, and you do something

2  else with them, like steal them -- I guess I'm just having

3  trouble with that not being a scheme to defraud -- and, you

4  know, you report back to the people you're holding it for that

5  you've only done lawful things, but you haven't, you've stolen

6  it, why -- I guess I'm just understanding -- you know, not

7  understanding that.  And I guess *Loughrin* -- is that the name

8  of the case?

9          **MR. ABRAMS:**  That's how I pronounce it.

10          **THE COURT:**  Is it about when you lie or about to whom

11  you lie?  I mean, because you've kind of cited it both ways, so

12  I just want to be -- and I apologize I did not quite get

13  *Loughrin* read yesterday.

14          **MR. ABRAMS:**  And I apologize for --

15          **THE COURT:**  You cited a lot of stuff.  I got almost

16  everything done.  You can hold me with that.

17          **MR. ABRAMS:**  The main thrust of the *Loughrin* case is

18  absolutely the issue of the lie, who it goes to, third party,

19  or does it eventually make its way to the victim.  But the way

20  that they get there in that case is to say that the -- let me

21  back up just a little bit on *Loughrin.*

22      What the Court was addressing was a claim by the defendant

23  that the Court should impose a new element in -- in the wire

24  fraud, graft a new element onto it that has never been, that

25  you have to intend to defraud the ultimate victim.  And the

1  Supreme Court says, "We're not going with you, Defendant,

2  because we don't need to.  The statute already has a causation

3  requirement.  The causation requirement is that the lie must be

4  the mechanism through which you obtained the funds."

5       And so -- and then it says -- and all of this happens in

6  response to this argument by the defendant that if you don't

7  adopt this new element, then the simple swindle cases turn into

8  wire frauds.  And so the Court says, "You're right.  If you

9  sell a fake Louis Vuitton handbag, represent it to be real,

10  obtain a check and give that to the bank, you haven't defrauded

11  the bank.  But we don't need to graft this new element on

12  because the statute already has a causation requirement."

13       **THE COURT:**  But here he allegedly obtained the money

14  from the insurance company, and then he lied to the insurance

15  company, and then the wire -- I mean, you don't have to show

16  that the wire communication contained a representation, but

17  he -- there's no problem with the wire transfers being in

18  furtherance of the scheme to defraud because he tried to --

19  allegedly tried to cover the scheme up.  So you don't have the

20  problem *Loughrin* was discussing.  I mean, you've got

21  misrepresentations to the victim, stealing from the victim, and

22  wire fraud trying to cover up the theft.

23       **MR. ABRAMS:**  What's missing is causation between the

24  misrepresentation and taking the money.

25       **THE COURT:**  Isn't it a misrepresentation even, if you

1 don't affirmatively say actual words out loud, to take money
2 that you have a right to do legitimate things with and steal it
3 and say to Forefront, in Mr. Reifler's case, "I have a right to
4 give you this money to spend as you want to," and that's a
5 misrepresentation because he doesn't?  He has a right to invest
6 it in certain ways, not to invest it for -- invest it and spend
7 it for his own purposes.  I mean -- I guess, if that's what
8 you're saying.  Doesn't that exist here?

9        **MR. ABRAMS:**  So I don't think it exists here; I don't
10 think it's alleged here.  And the reason is -- and there is
11 intention between the case law that says embezzlement is wire
12 fraud and our argument here.  There's intention there.  I
13 understand that.  And I think the reason that we are not
14 tripped up by that intention is the fact that Mr. Reifler
15 initially invested the money into Forefront, and then the money
16 was used for Forefront expenses.  And so the -- it's not a case
17 of embezzlement because when the money was taken from the trust
18 account, it was invested into Forefront.

19        **THE COURT:**  Well, that's the question.  Was it really
20 an investment, or was it just stealing?  I mean, isn't that a
21 factual question?

22      They're over there nodding that I have put my thumb on it.

23      So, I mean, yes, if you're right about the facts, you win,
24 but you win with the jury.  I mean, I guess that's what I keep
25 coming back to, this -- the indictment alleges all kinds of

1  stuff; and when you read it just kind of like a normal person,
2  to the extent a normal person reads indictments, it basically
3  says Mr. Reifler stole a whole bunch of money from -- he held
4  it for one reason to do lawful things with; and instead of
5  doing that, he stole it and used it for his own purposes; and
6  it involved some wire communications in the process.

7      I just don't understand how -- I mean, if you're right,
8  then you're going to win in front of the jury, right?  If he
9  was like, "No, no, this was a legitimate investment," and he
10 invested it into Forefront, and "the fact that Forefront, you
11 know, did a bad job, well, you know, that was not my intent" --
12 I don't know what he might say, but --

13          **MR. ABRAMS:**  And --

14          **THE COURT:**  -- or what the Government can or cannot
15 prove about his intent, but a scheme to defraud, that kind of
16 involves his intent.

17          **MR. ABRAMS:**  It certainly involves his intent,
18 Your Honor.

19      Two responses to that.  Number one is that the issue that
20 we understand this case to be about is -- is not -- basically,
21 it's what the Government has said, he took the money and put it
22 into ineligible investments, investments that didn't meet the
23 requirements of the contract that he signed.

24          **THE COURT:**  Right.  That's one thing they say.

25          **MR. ABRAMS:**  And then -- so I don't -- if -- well,

1  if --

2          **THE COURT:**  If that's all they ever prove -- I'll ask

3  the Government when it's their turn or, perhaps, they'll

4  remember to answer it.  If that's all they can prove, then it

5  does seem like maybe you would win.

6      But they've got all these other allegations in there

7  about -- that tend to indicate he was actually trying to

8  defraud the insurance company.  So why is that -- I mean, don't

9  you look at the whole situation, the whole ball of wax?

10         **MR. ABRAMS:**  You absolutely look at the whole

11  situation, and what we don't know right now and why we filed

12  this motion is what is the lie that the grand jury found that

13  he told that -- through which the Government has to prove he

14  obtained the money.  Without that, we can't defend Mr. Reifler,

15  because what happens in this circumstance where you say he

16  obtained money -- it looks really bad.  He had an intent to

17  defraud, but they don't identify the lie that he is alleged to

18  have told.  What happens then is we have to defend by saying he

19  did everything right, and it shifts the burden to us, and so

20  that's why --

21         **THE COURT:**  Well, they're going to have the burden at

22  trial.

23         **MR. ABRAMS:**  Certainly they will, but we don't know

24  what lie they are saying he told.  They have posited two in

25  their response.  There's another concept here we're talking

1   about.

2       But what's not clear -- and I think the fact that we now

3   have three potential theories indicates that we don't know what

4   the grand jury found; and this is the exact reason why the

5   courts, in addressing issues like this, have said the

6   indictments charging obtaining property by false pretenses have

7   to identify what the false pretenses were, because if we -- you

8   know, we would be glad to go to trial on the issue of did he

9   invest the money in Forefront.  If that's what he's charged

10  with, that he didn't invest the money in Forefront -- you know,

11  I don't think they would stake themselves out on that because

12  the indictment says he invested the money in Forefront.

13      When you look at the indictment and have the benefit, of

14  course, of reading the discovery and all that stuff, what

15  happened here, from our perspective -- and I know this is not

16  something you can necessarily consider, but it might help you

17  understand the problem that we're having.  The issue,

18  Your Honor, that we're seeing is the money was invested in the

19  first instance in Forefront and other things, and then as the

20  indictment says -- I think it's paragraph 26 -- Forefront and

21  Mr. Reifler's employees told the fiduciary of these funds.

22  "Here's what we've done with the money."  At that point that

23  person, Individual A, I believe, in the indictment, says,

24  "Whoa.  Those are ineligible investments."

25          **THE COURT:**  And then he repeatedly -- he says, "I'm

1  going to move it," but --

2       **MR. ABRAMS:**  But -- and the indictment then alleges

3  that he says he's going to do things with the money and doesn't

4  do those things.  That's in the indictment.

5       **THE COURT:**  Right.  And then he -- I mean, certainly

6  that statement -- they're saying he never intended to comply

7  with that promise.

8       **MR. ABRAMS:**  But it's not in there.  The grand jury

9  doesn't say he says he was going to fix it and never intended

10 to fix it.  It says he was going fix it, and he later told lies

11 in response to audits, and it says that --

12      **THE COURT:**  I mean, there's all kinds of lies in

13 there, you know, that -- or alleged lies.

14      **MR. ABRAMS:**  The problem is we don't have -- we don't

15 know -- because -- we think it's not in there, the lie that the

16 Government says was the mechanism by which he obtained the

17 funds.  That's -- that's the heart of the issue.

18      **THE COURT:**  Okay.

19      **MR. ABRAMS:**  And so -- and we don't think it's in the

20 indictment; and when the Government is pressed on this issue,

21 they say, "Yes, those lies are in the indictment.  He told two

22 lies.  He stole the money in the first instance from a third

23 party and used that to obtain the money.  That's a lie."

24      **THE COURT:**  So I just want to repeat so that I

25 understand you correctly.  If when I steal your -- when I take

 1  your money I intend to steal it from you, but I don't lie to

 2  you about it directly, I just to myself silently have that

 3  intention, or if after I take it from you with the intention to

 4  do only lawful things I develop an intention to steal it from

 5  you, and then I steal it from you, okay, but I don't lie to you

 6  about it until after that, there cannot be wire fraud?

 7          **MR. ABRAMS:**  Yes.

 8          **THE COURT:**  Okay.

 9          **MR. ABRAMS:**  I agree with that.

10          **THE COURT:**  The misrepresentation you are saying has

11  to occur before or contemporaneous with, I'm just going to say,

12  the theft?

13          **MR. ABRAMS:**  Yes, Your Honor.

14          **THE COURT:**  That's your position?

15          **MR. ABRAMS:**  It is.  It is.

16          **THE COURT:**  Okay.  And the case you are relying on for

17  that is this *Loughrin* case?

18          **MR. ABRAMS:**  For the proposition that the -- to be the

19  cause through which you obtained the money.

20          **THE COURT:**  I'm talking about the timing because you

21  are equating timing with causation.

22          **MR. ABRAMS:**  Yes.

23          **THE COURT:**  Okay.

24          **MR. ABRAMS:**  Absolutely.  So that -- from a legal

25  perspective, our position is if you just walk into a store and

1  the person is not minding the till, you reach over and grab the

2  money and walk out –- so you've gone in the store; you've

3  stolen the money; never said anything to anybody; you walk out

4  and take it home; and a couple months later the store clerk or

5  the owner says to you, "You stole our money," and you say, "No,

6  I did not," you have not committed wire fraud.  You committed

7  theft.

8          **THE COURT:**  Well, you had –- yeah, it's a little

9  different from this.  And tell me where lulling, l-u-l-l-i-n-g,

10 communications can't be the lies when they're lies and they

11 allow you to keep control of the money that you have not yet

12 stolen, at least arguably.  That's what they say even if you

13 don't steal any more money after that.  I don't have a complete

14 grip on the timing, I'll admit.  I mean, the cases seem to say

15 that can be enough.

16         **MR. ABRAMS:**  The cases, from our perspective, say

17 lulling can be –- lulling communications can be executions of

18 the scheme.  So it appears –- we think *Pierce* is very helpful

19 for us because *Pierce* draws this distinction.  It says lulling

20 communications are actionable wire fraud communications, but it

21 cites the Supreme Court case in *Lane* saying those lulling

22 communications have to follow the obtaining money by fraud.

23 And I'm looking for the --

24         **THE COURT:**  You're saying that *Lane* says that?

25         **MR. ABRAMS:**  Yes, Your Honor.  The quotation from

1  *Pierce* is the Supreme Court has said that mailings occurring

2  after receipt of the goods obtained by fraud --

3       **THE COURT:**  Well, is -- I don't understand why it

4  isn't fraud to steal from somebody.  That's my problem.  I

5  mean, whether you say out loud "I'm stealing from you" or "I'm

6  not going to steal from you, but I'm actually going to" -- I

7  mean, I don't understand how that's not fraud.

8       **MR. ABRAMS:**  I think it's not wire fraud, Your Honor,

9  because -- because of the statute.  The statute says you have

10  to obtain property by means of a false representation.

11  Congress certainly could have said it is illegal to steal full

12  stop.  They didn't.  They have done that in other context, but

13  they didn't.

14     And there's a lot of case law the Supreme Court talks

15  about -- they're worried about the issue of federalizing every

16  property crime.  They want to federalize only the crimes that

17  involve some type of federal interest, and so a theft in and of

18  itself is -- is not a wire fraud because of the words in the

19  statute, and we think that those are -- that's an intentional

20  limitation.

21     And we know that the Supreme Court doesn't think every

22  theft is a wire fraud because they talk about more in this

23  swindle -- well, that's not a great example because there's a

24  fraud there.  They just didn't use a wire.  You know, there's a

25  distinction between theft, walking in and grabbing somebody

1   else's money and walking out, and coming in and saying, you

2   know, "I'm going to take your money, deposit it in the bank."

3       **THE COURT:**  *Pierce* -- how is *Pierce* different?

4   They're running the bingo operation.  They take your dollar for

5   your bingo card, which they have a right to do under the

6   agreement with the nonprofit, and then they just decide

7   themselves whether to put it towards the appropriate

8   contractual purpose, pay the expenses and then give the rest to

9   the nonprofit, or to just keep it.  And so how is this

10  different?

11      **MR. ABRAMS:**  First, it's different because the only

12  issue addressed in *Pierce* is just a separate issue altogether

13  than whether the underlying scheme was a scheme to defraud.

14  But in *Pierce*, they took the money with the representation

15  that, "I'm taking your money from the customer, and I'm giving

16  it to the nonprofit."  They knew.  The scheme was they weren't

17  going to do that.

18      **THE COURT:**  And so --

19      **MR. ABRAMS:**  They didn't just, you know, grab the

20  person's money and run.

21      **THE COURT:**  Right.  But your guy is alleged to have

22  done the same thing, to take the money, not when it was turned

23  over to him in trust.  I mean, we'll hear what they say about

24  that, because I have some appreciation for your point about the

25  allegations that he initially got the money or became the

1  investment advisor based on lies.  But, you know, when he moves

2  the money into Forefront, that's based on a lie that he is

3  going -- that Forefront is a legitimate investment and not just

4  a shell to pay his own personal obligations or -- I mean, I'm

5  not -- it seems like the same exact thing, just using -- maybe

6  I'm missing something.

7          **MR. ABRAMS:**  And I think the issue -- so Forefront --

8  this is not a -- just for context, we don't think, a Ponzi

9  scheme case where there's no going concern.  We think there are

10  real offenses, real businesses.  These folks are doing real

11  things.

12          **THE COURT:**  Right.  But that's a factual question for

13  the jury as to whether it's a real investment or whether it's

14  not.

15          **MR. ABRAMS:**  So if it were alleged that Forefront was

16  a sham full stop, then we would know what we were defending

17  against.  That's not alleged.  We think it's not alleged

18  intentionally, because they're not setting themself up --

19          **THE COURT:**  Does it have to be a sham if I say, "Okay.

20  I'm going to take your money and I'm going to invest it and I'm

21  just going to spend half of it for my own purposes and the

22  other half I'm actually going to invest"?

23          **MR. ABRAMS:**  I think I haven't been clear about where

24  Forefront stands in this chain.  The money wasn't given to

25  Forefront in trust.

1      **THE COURT:**  Right.

2      **MR. ABRAMS:**  The money was --

3      **THE COURT:**  It was invested, as you say, in Forefront.

4   It was given to this -- somebody else.  It started with an S,

5   right?

6      **MR. ABRAMS:**  Summit.

7      **MR. TOPETZES:**  Summit, Your Honor.

8      **THE COURT:**  Summit.

9      **MR. ABRAMS:**  There are a lot.  The complexity here

10  is -- it's one of the reasons we need to know what we're

11  defending against.  We don't think the indictment does that for

12  us.  He doesn't --

13     **THE COURT:**  I'm going to get you to finish up in about

14  5 minutes.

15     **MR. ABRAMS:**  Yes, Your Honor.  Thank you.

16     The -- the basic issue, we think, is the Government saying

17  he knowingly -- he made a promise -- he got access to the money

18  by saying he would do something that he didn't intend to comply

19  with.  From all the discussions we've had from the Government

20  and from their response and from our reading of the indictment,

21  our understanding is that's their case; that he made a promise

22  to invest in certain assets knowing at the time he made the

23  promise that he wasn't going to comply with it.  We understand

24  that to be their theory.  That theory is not alleged in the

25  indictment.

1    If they have a different theory, we think that -- in light

2  of all the different potential ways that the Government, you

3  know, might say that they can show fraud, then we've got to

4  have a Bill of Particulars so we know what the

5  misrepresentation is that we're defending against.

6          **THE COURT:**  All right.

7          **MR. ABRAMS:**  And that -- and so our -- you know, we

8  would ask Your Honor to stay focused on what the Government

9  says in their response to what this case is.  They say this

10  case is about two things.  They say it's about him lying to

11  obtain access to the money because they say -- it's alleged he

12  stole the money that he then used to purchase his ability to

13  get involved with the --

14          **THE COURT:**  Here's what they say.  I'm looking at

15  their brief, Docket 36, page 13.  The indictment asserts that

16  the Defendant, one, lied to obtain access to the trust assets.

17  I'm going to ask them about that because I'm tentatively with

18  you that it does not allege that.  They'll point me, I'm sure,

19  if they can.  That's what they say.

20    Then, two, lied about how he would invest the trust

21  assets -- there's bunches of stuff in the indictment about

22  that -- and created false and fraudulent documentation of

23  purported promissory notes and agreements.  There's buckets of

24  stuff in there about that.

25    So even if you're right that they don't have a fact about

1    lying to obtain access to the trust assets, don't we still have

2    enough?  Don't you know what you're defending against because

3    of the other two things?  I mean, that's clear in the

4    indictment that they're alleging those two things.

5            **MR. ABRAMS:**  From our perspective -- I'll take numbers

6    two and three in turn, Your Honor.  Number two is he lied --

7    what we're calling a false promise theory.  He promised to

8    invest only in eligible assets, and he didn't.

9        The problem with that theory is it's not in the indictment.

10   The indictment does not say that when he signed the Investment

11   Advisory Agreement he intended to breach it.  The indictment

12   says -- this is all -- I think it's 14, 15, and 16 -- that he

13   signed the Investment Advisory Agreement and then breached it,

14   but the grand jury did not find that he signed that agreement

15   and made that promise intending to breach it.  So that is a

16   valid theory, what the Government has posited here, if the

17   grand jury found it, but they didn't.

18       The Government says they found it, and they point to

19   paragraphs 23, 24, and 25.  Those paragraphs do not have a

20   misrepresentation at all, so they cannot allege --

21           **THE COURT:**  Okay.  Well, you've made that argument, so

22   I understand that.

23           **MR. ABRAMS:**  So from our perspective, that second

24   theory, the false promise theory, while it could be a valid

25   theory, is not a theory that's in the indictment; and it

1  wouldn't be difficult for the grand jury to have said he signed
2  this document intending to breach it.

3      We think that's critical because there's abundant case law
4  you cannot charge every breach of contract, and as a fraud, you
5  have to find that you entered into the contract intending to
6  breach it.  So that's what's missing with that theory -- the
7  false promise theory.

8          **THE COURT:**  And it's also your position that every
9  single false misrepresentation has to be alleged in the
10 indictment?

11         **MR. ABRAMS:**  The one that they -- the ones that
12 they're relying on to prove that there is a wire fraud scheme
13 have to be in the indictment, from our perspective.

14         **THE COURT:**  Okay.  All right.  I'm going to give you
15 one more minute.

16         **MR. ABRAMS:**  And then the third theory they have is he
17 formulated false documents.  That's all in the indictment,
18 certainly.  That's in the indictment in the context of a
19 cover-up type of conduct that occurs well after the property is
20 obtained, and it didn't comport with what we believe the law
21 is, that there has to be a lie that corresponds -- that causes
22 the obtaining of property.  So you can have, you know,
23 obstructive behavior through lies that isn't wire fraud because
24 it happens after the property has already been obtained.  It
25 can't have caused the obtaining of the property.

1    So Theory 3, we think, fails on that basis that Your Honor

2  has really gotten to the heart of, which is that we believe the

3  lie has to occur contemporaneously or somehow cause the

4  obtaining of the property, and those subsequent

5  misrepresentations down the road are in response to audits and

6  those things.

7           **THE COURT:**  Okay.  Thank you.

8           **MR. ABRAMS:**  Thank you, Your Honor.

9           **THE COURT:**  From the Government?

10           **MR. TYNAN:**  Yes, Your Honor.  Thank you.

11    So to start off, Your Honor, I'd like to just directly

12  address the Court's questions sent -- sent out yesterday

13  afternoon with respect to questions to be anticipated today.

14    So one of those questions was for the Government to

15  directly walk the Court through the representations -- false

16  representations in the indictment, and I can do that.

17           **THE COURT:**  Uh-huh.

18           **MR. TYNAN:**  And the Defendant has also made various

19  arguments why each of those representations, though not all of

20  them, are insufficient, and I can respond to those as well.

21    So as a general premise, Your Honor --

22           **THE COURT:**  As a general premise?

23           **MR. TYNAN:**  As a general premise, it is not right to

24  say that the Government needs to allege every single false

25  misrepresentation in the indictment under federal Rule 7.  The

1  Government does not need to present all of its evidence in the
2  allegations in the indictment.  It only needs to say what the
3  elements of the offense are and properly inform the Defendant
4  of the charge so that he can defend himself against double
5  jeopardy concerns later on down the road and knows what he is
6  facing at trial and --

7         **THE COURT:**  Can you pull the mic up just a little?
8  And then just try not to talk too fast, especially -- you know,
9  we're all wearing masks because the pandemic is still causing
10 lots of problems, so if you'd slow down just a little.

11        **MR. TYNAN:**  Yes, Your Honor.

12        **THE COURT:**  Go ahead.

13        **MR. TYNAN:**  And so from -- from the start, the
14 Government's position is that the 19-page, 50-something
15 paragraph indictment adequately informs the Defendant what the
16 charges are, as well as what the prosecution's theory is.

17    With respect to the various different types of false
18 representations, promises, and lies in the indictment, they're,
19 generally speaking, five different buckets.

20    The first bucket deals with the false representations by
21 the Defendant to the victim that his investments complied with
22 the advisory agreement after the victim and the Department of
23 Insurance started audits.  That is in paragraphs 31 and
24 explained in further detail in paragraph 32.  Now, two of those
25 emails are the basis for Counts One and Two.

1        The second bucket includes false representations by the

2    Defendant to the victim when the victim tried to liquidate his

3    assets; that he was not the investment advisor of the trust and

4    that the victim should contact the reinsurer.  That's another

5    lie.  That's in paragraphs 33 and 34, and those two emails are

6    the basis for Counts Three -- for Count Three and Count Four.

7            **THE COURT:**  Allowing him to keep the money.

8            **MR. TYNAN:**  Allowing him continued access to the

9    assets, because if the Defendant had told the truth, the victim

10   would have known that something was wrong, and they would have

11   gotten their money back or at least would have liquidated it so

12   that they weren't tied up in other investments.

13       With respect to the next bucket, in paragraph 28, false

14   representations by the Defendant to Individual A, who is not

15   just some random third party -- he is the reinsurer acting on

16   behalf of the victim in this case.

17           **THE COURT:**  So the victim's agent?

18           **MR. TYNAN:**  I think you could call him the victim's

19   agent.  He is the reinsurer for the life insurance company and

20   definitely has contractual, as well as fiduciary, obligations

21   to the victim in this case.

22       And those representations by the Defendant were that he

23   would bring the investment portfolio into compliance with the

24   agreement, and he did not.

25       And then in paragraph 29, another bucket of false --

1        **THE COURT:**  Where was that?

2        **MR. TYNAN:**  Paragraph 28, Your Honor.

3        **THE COURT:**  All right.

4        **MR. TYNAN:**  The next series of false

5   representations -- and this is in paragraph 29 -- are false

6   representations about the true nature of the investments.

7        And then finally, paragraphs 15 and 16 discuss, summarizing

8   here, a false promise to invest in eligible investments.

9        And so while the Defendant in his motion attacks each of

10  these different false representations as insufficient alone,

11  they are not for reasons that I can go into.  But when viewed

12  collectively, they certainly allege a scheme to defraud to

13  obtain money or property.

14       **THE COURT:**  Now, so that kind of gets to what I

15  understand to be their key.  It seems like what they're saying

16  is he got the money -- I'm not sure -- either when he signed

17  the trust agreement and came into lawful possession or --

18  arguably, lawful possession of the funds.  So there's one time

19  he obtained money.  And I guess the other time he obtained

20  money was when he invested it into Forefront or whatever he --

21  whatever self-dealing he was doing, and I guess the other time

22  he obtained money was when he spent the money for his own

23  purposes.

24       Now, I don't know when -- their argument is you've got to

25  make the false representation to obtain the money.  First, do

1  you agree with that?  And if you do agree with it, when is

2  the -- when did he obtain the money for that on -- for purposes

3  of talking about it this way?  Do you see what I'm asking?

4          **MR. TYNAN:**  I do, Your Honor.

5      And I would agree with the various different ways in which

6  the Defendant obtained money that Your Honor recited.

7      I would add one additional bucket to that, and that's

8  directly alleging -- and it's paragraph 22, and I think this is

9  a very important paragraph for a number of reasons.  In

10  paragraph 22, it explains that before the Defendant ever

11  entered into the advisory agreement with the victim, he, quote,

12  diverted approximately $1.75 million from the trust account to

13  Real Estate Company 1.  As explained in paragraph 21, the trust

14  account is the Wells Fargo account used by Trust Entity 1,

15  which is the trustee, to maintain the victim's trust assets.

16      So, in other words, before the Defendant even entered the

17  advisory agreement, he literally stole money from the victim;

18  and so considering that allegation in the indictment, it's not

19  just a contract case.  That's evidence -- that's an allegation

20  that the Government will prove at trial to show that the

21  Defendant, before he ever signed the agreement, had the intent

22  to defraud because he had already stolen almost $2 million from

23  the trust.

24      And so I think there's a little bit of confusion in some of

25  the Defendant's papers about what this actually is.  So the

1 Defendant conflates the allegations in paragraph 21 and
2 paragraph 22 because paragraph 21 talks about lies to obtain
3 access to the trust.  He diverted funds from a different trust
4 entity in order to buy in to the deal with North Carolina
5 Mutual.  That is separate and apart from the diversion of the
6 victim's money in paragraph 22.

7     And so those allegations, as well as the others, the five
8 buckets that I briefly went through, paint a picture of the
9 scheme to defraud that takes this case way outside of the cases
10 in the Defendant's brief concerning contractual cases.

11     With respect to the Defendant's arguments as to each of
12 these buckets, the first argument is that the communications
13 that underlie Counts One through Four, because they occurred
14 after, purportedly, the obtaining of the money, they cannot
15 qualify as representations -- false representations for
16 purposes of a scheme to defraud; and the Government has cited
17 *Pierce* and its progeny to support that is wrong, especially in
18 the case here, because these lies enabled the Defendant to
19 continue to have access to the funds.

20     So the middle of 2015 when Individual A sends an email to
21 the Defendant, as alleged in paragraph -- I think it's 27 -- he
22 makes a number of lies that allows him to continue to have
23 access to that money all the way through 2016.  So he is lying
24 to the victim in order to obtain access to these funds.

25         **THE COURT:**  In order to --

1    **MR. TYNAN:**  Obtain access to the funds.

2    **THE COURT:**  In order to obtain ongoing access.

3    **MR. TYNAN:**  Ongoing access.

4    **THE COURT:**  Uh-huh.

5    **MR. TYNAN:**  As to the -- the misrepresentations to

6 Individual A himself, essentially the Defendant says that,

7 well, lies to a third party and not the victim are irrelevant

8 for purposes of a scheme to defraud under the wire fraud

9 statute; and the Government used -- this is a convergence

10 argument, which essentially means there needs to be -- the

11 person who is deceived needs to be the same person who is

12 injured by the fraud; and the Government cited a supplemental

13 case in its filing on Tuesday, *United States versus Wynn*,

14 which, first of all, recognizes that that issue has not been

15 decided by the Fourth Circuit.

16    **THE COURT:**  By the Fourth?

17    **MR. TYNAN:**  Fourth Circuit.

18    And in the end held that even though the misrepresentations

19 were not made to the victim in that case, they still fell

20 within the statute because it furthered the overall objective

21 of the fraud, which was to deceive the victim.

22    And that's exactly what we have here, where the Defendant

23 has -- as alleged in the indictment, is lying to the reinsurer,

24 Individual A, with the purpose of defrauding the victim, which

25 is North Carolina Mutual, the life insurance company alleged in

1   the indictment.

2       And, Your Honor -- unless Your Honor has any other

3   questions, I'd like to address *Loughrin*, which was referred to

4   in the Defendant's argument.

5           **THE COURT:**  Yes.

6           **MR. TYNAN:**  And first of all, Your Honor, I certainly

7   understand how this happens, but the Government hasn't had an

8   opportunity to fully research the impact of *Loughrin*.  To the

9   extent the Court has questions about it after the hearing, we

10  would respectfully request the opportunity to address those in

11  another paper, if necessary.

12      However, I would like to note that the Defendant takes an

13  overbroad interpretation of that case.  The issue in that case

14  was whether under the bank fraud statute, not the wire fraud

15  statute -- and I understand there's parallels through the two

16  statutory regimes.  The issue was whether the defendant needed

17  to intend to defraud the bank.  That was the issue in that

18  case, and the Court found that that specific element was not in

19  the statute, and that the Court didn't need to read that

20  element into the statute because the text of the statute "by

21  means of" was a textual limitation that required some causal

22  connection between the lie and the receipt of funds.  Those

23  concerns are not present here.  The Defendant was the one who

24  got the money from the victim.  There's no issue about whether

25  or not there was a causal connection between his lies and the

1 money.

2     So for those reasons, Your Honor, the Government submits

3 that *Loughrin* doesn't apply here, but, again, to the extent the

4 Court has further questions about it, we'd be happy to address

5 it in another brief.

6         **THE COURT:**  Okay.  So in your timeline, he –– I'm

7 trying to –– I don't have the chronology straight because the

8 dates are interspersed throughout the indictment, and I have

9 not yet tried to make a chronology.

10     But what you're saying is first he had access to the

11 victim's money, not pursuant to that contract but through some

12 other way, and he stole some of it; and then he signed a

13 contract.  And even though you don't explicitly say in the

14 indictment that he never intended to comply with the promise in

15 the contract to only invest in eligible investments, you're

16 still saying that because –– but you don't say that explicitly,

17 right?

18         **MR. TYNAN:**  That's correct, Your Honor.  The

19 indictment does not use those words.

20         **THE COURT:**  Okay.  But you're saying you should read

21 it that way because of the theft before he ever signed the

22 contract.

23         **MR. TYNAN:**  Correct.  We believe that the allegations

24 in the indictment, if proven at trial beyond a reasonable

25 doubt, would allow the jury to infer reasonably that before he

1  ever entered into the contract he had the intent to defraud.

2       **THE COURT:**  And then he gets access to the money for

3  the stated purposes in the advisory contract or investment

4  contract, whatever y'all are calling it.  So that's one time he

5  obtains the money under the statute.  He obtains money, you're

6  saying, by -- as part of a scheme to defraud, and the

7  fraudulent representation for that is he never intended to

8  comply with the promises in the contract.

9       **MR. TYNAN:**  Correct, Your Honor.

10      **THE COURT:**  Okay.  And then there are other --

11 obtaining money under the wire fraud statute when he moved the

12 money to Forefront.  Are you saying that?

13      **MR. TYNAN:**  So, Your Honor, the -- the theory would be

14 that he -- once he obtained access to the money, he then

15 diverted that money for improper purposes.  Those are -- those

16 are outlined in the indictment.

17      **THE COURT:**  Uh-huh.

18      **MR. TYNAN:**  And so that does fall within the statute

19 for purposes of obtaining money and/or property, because he is

20 diverting that money in some circumstances, as alleged in the

21 indictment, for the benefit of his own companies --

22      **THE COURT:**  Uh-huh.

23      **MR. TYNAN:**  -- which is also impermissible under the

24 Investment Advisory Agreement.

25      **THE COURT:**  But you're not saying that anybody who

1  invests in an unauthorized investment or ineligible investment

2  is committing fraud?

3         **MR. TYNAN:**  Correct, Your Honor.  We had other indicia

4  of fraud in this case.  In addition to the allegation in

5  paragraph 22, which we've already discussed, we also have the

6  lies which happened after he spends the money, and those speak

7  to the Defendant's frame of mind -- state of mind.  And to the

8  extent the defense disagrees about that and has evidence to

9  show or not show that that's not actually what was going on

10  here, that is for the jury to decide.

11     The Government believes it has powerful evidence of the

12  Defendant's state of mind, as alleged in the indictment.  He

13  created false documents that this went there.  He told somebody

14  on the recorded call -- this is alleged in the indictment --

15  that when he diverted the money that was very wrong.  So he

16  knew before he ever entered this agreement that what he had

17  done was very wrong.  Those are powerful allegations of intent

18  to defraud, and they take this case outside of your generic

19  contractual breach.

20         **THE COURT:**  Okay.

21     And so in my simplistic use of the word "stealing," when

22  did he steal the money?

23         **MR. TYNAN:**  Well, he certainly stole the money in

24  paragraph 22, before he ever signed the agreement, when he

25  diverted the $1.75 million.  He certainly stole it then.

```
 1      He certainly stole the money when he got access to it
 2   because the Government would submit that the evidence will show
 3   at trial that he never intended to use that money as he
 4   promised to do, to make eligible investments under the
 5   contract.
 6          THE COURT:  All right.  And it's your position that
 7   the fact that you don't explicitly say that in the indictment
 8   does not make the indictment deficient, because I understand
 9   the Defendant to say that does make it deficient in terms of
10   that claim.
11          MR. TYNAN:  Yes, Your Honor.  The indictment does not
12   use those words, but I would submit that the facts are asserted
13   in the indictment itself --
14          THE COURT:  Okay.
15          MR. TYNAN:  -- which would allow the Government to
16   argue at trial, argue to the jury that that was the basis.
17          THE COURT:  When else did he obtain the money?  I'm
18   saying "stole" as sort of a substitute for "obtain" because
19   "stole" implies, to me at least, defraud.
20          MR. TYNAN:  The Government's position is that his
21   continued access to the funds, which were facilitated by the
22   lies further on down the road, as we've discussed already, is
23   part of an overall scheme to obtain money.  That is part of the
24   same scheme to defraud.  That continues for as long as the
25   Defendant continues to lie about the true nature of the
```

1   investments.

2           **THE COURT:**  Okay.

3           **MR. TYNAN:**  So the misrepresentation --

4           **THE COURT:**  So I guess I don't quite -- I guess I

5   don't need to understand this, but he actually had control over

6   this money before he signed -- before there was any agreement

7   about how -- what he would do with the money?

8           **MR. TYNAN:**  Access to the trust.

9           **THE COURT:**  Access to the trust?

10          **MR. TYNAN:**  Yes.

11          **THE COURT:**  And at that point -- well, how did --

12          **MR. TYNAN:**  So I would agree with Your Honor that it

13  is confusing, but that will be --

14          **THE COURT:**  That's what they did.

15          **MR. TYNAN:**  That's what they did, yeah.

16          **THE COURT:**  Okay.  I'm just looking to see if I have

17  any other questions for you.

18      (Pause in the proceedings.)

19          **THE COURT:**  All right.  Go ahead.  Anything else you

20  want to say?

21          **MR. TYNAN:**  No, Your Honor.  I have no further

22  comments, unless the Court has additional questions.

23          **THE COURT:**  Okay.  All right.

24      I can give you 5 minutes for rebuttal, Mr. Abrams, since

25  that didn't actually take all that long.

1          **MR. ABRAMS:**  Absolutely.  I'll focus really on these

2    five buckets, Your Honor.

3          We've talked about the false-promise theory.  Your Honor

4    understands that issue, I'm quite sure, just whether it has to

5    be in the indictment or not.

6          As to the others, Your Honor, the one, two, three, and four

7    are -- those paragraphs the Government cites for each of those

8    come under the heading in the indictment of "Bradley Carl

9    Reifler Concealed His Misappropriation."  So the grand jury

10   says what they think this is, that he is not doing what the

11   Government says these paragraphs say and trying to continue to

12   access the funds.  That's not in the indictment.

13         What's in the indictment is that those misrepresentations

14   are lulling communications.  That's what the grand jury

15   alleged.  They're concealing a prior misrepresentation.  So if

16   the grand jury -- so what we have here is the Government has

17   seen our stuff.  They've gone through and they've said, Well,

18   we now think the indictment supports another reading, a new

19   theory, and that is the subsequent misrepresentations allowed

20   him to continue to access the funds.

21         But that's not what the grand jury said.  The grand jury

22   says what those subsequent representations were for in

23   paragraphs 31 and 33 and -- in 31, they say those

24   misrepresentations were done "to assuage Life Insurance Company

25   1's concerns regarding the compliance of the investments...."

1    **THE COURT:**  Right, so he could keep the money.

2        **MR. ABRAMS:**  It doesn't say that.  It doesn't say --

3        **THE COURT:**  Well, why else would he do it?  I mean, he

4  continued to have access to the money, right?

5        **MR. ABRAMS:**  It doesn't say he continued to have

6  access to it.  We're inferring all this, and maybe these are

7  reasonable inferences, you know, at a -- for a jury to make, if

8  that's what we're doing.  But what we have to do here is say

9  did the grand jury find that the purpose --

10       **THE COURT:**  Well, if he did that?  It says that he did

11 that -- let me think.  What was the date?  The first quarter of

12 2016, according to paragraph 30.  And then in paragraph 33, in

13 August, he tried to liquidate; and that's when he allegedly

14 lied about not being the investment advisor.

15    Well, I mean, it -- it may not say he still had access to

16 the money, but obviously he did.  I mean, that's implicit in

17 what they're saying.  I think it's actually explicit.

18       **MR. ABRAMS:**  Well, they say he lied about this to

19 divert blame in paragraph 33.  It's the second -- the third

20 sentence "Bradley Carl Reifler attempted to divert"

21 (indiscernible).

22    (The court reporter requested clarification.)

23       **THE COURT:**  He said he attempted to divert blame, but

24 in paragraph 34, as a continuation of all this, he says he

25 wasn't the investment advisor.

1    **MR. ABRAMS:**  You don't maintain access to something by
2  saying, "I'm not the investment advisor."  He has got no basis
3  to be involved in this.

4    **THE COURT:**  Okay.  Well, it seems -- I don't know.  It
5  seems to me you're -- you're not looking at the big picture.
6  I'm having trouble understanding why this isn't -- you know,
7  looking at the big picture -- and you have to look at all the
8  facts and circumstances -- it pretty clearly alleges that he
9  was in it to use the insurance company's money for his own
10  purposes, and that he actually did that in various ways, and
11  then he tried to cover it up and, you know, delay discovery and
12  delay losing access to the money.  I don't understand why it
13  doesn't allege that.  That's what it seems to say when you read
14  it as a whole.

15    **MR. ABRAMS:**  So I think it would have to say -- this
16  is, again, how much specificity we need from the grand jury;
17  and we have case law that says when the criminality turns to
18  core issues, those core issues have to be specifically alleged;
19  and the core issue -- with this new theory that these
20  subsequent misrepresentations were actually attempts to
21  continue to have access, the core issue is did he tell them
22  those things with the intent to obtain the money, or did he
23  tell them with the intent that's listed in the indictment, to
24  divert blame and to make people think that the investments were
25  compliant.  And so, you know, the intent -- the grand jury did

1  not find that he had the intent to tell these lies to obtain

2  money.  They actually say what the purpose of those lies was.

3      And so while, again, we could -- you know, there may be a

4  way to draft the indictment to say that, but those key facts

5  that the grand jury has to find are not here.  The grand jury

6  says what they thought happened.  They thought that these were

7  not -- it does not say he told these subsequent lies to

8  continue to have access.  It says he told these subsequent lies

9  to allay concerns and to divert blame.  So we could --

10      **THE COURT:**  But doesn't that show his intent for the

11  entire -- I mean, people look at what you say after you've done

12  something as reflecting on your intent when you did it, so --

13      **MR. ABRAMS:**  So this all comes under the heading of

14  he's concealing his misrepresentation.  That's what they

15  found -- I'm just looking at the words.  The indictment doesn't

16  say he told those lies.

17      **THE COURT:**  I guess I'm just having a little trouble

18  because on the one hand you're saying, well, this part is

19  conclusory; but when they get into the details, you're like,

20  oh, well, insufficient and -- so if they say it generally, you

21  don't like it because it's not specific; and if they say it

22  specifically, you say it doesn't -- it's not general enough.  I

23  mean, I'm not -- I'm having a little trouble with that.

24      Is that not right what -- have I misunderstood you about

25  that?

1      **MR. ABRAMS:** I -- that's certainly not -- I'm not

2  trying to have it both ways. I'm not. From our perspective,

3  as to the first theory -- well, as to the first theory, the

4  grand jury needed to say that he signed the contract but didn't

5  intend to honor it. As to the second theory, as to buckets one

6  through four, that was just outlined. The grand jury needed to

7  say those lies were told with an intent to maintain access to

8  the funds, and it doesn't say that.

9      **THE COURT:** All right. Let's take a -- we don't have

10  anybody in custody. I think maybe we can get in and out in

11  about 10 minutes, and we'll come back and move on to some of

12  the other issues in the case. So let's take a 10-minute

13  recess.

14    (A morning recess was taken from 11:03 a.m. until

15  11:28 a.m.; all parties present.)

16      **THE COURT:** Okay. Item next, discovery status. I'm

17  kind of afraid to ask.

18    So, you know, I know that in resolving the motion to

19  suppress, the Government has made some pretty significant

20  agreements as to what their evidence is going to be, which --

21  or the universe from which their evidence will come, and that

22  certainly has some implications for the Defendant's motion for

23  a list of trial exhibits, which we can talk about in a little

24  bit. But I just kind of want to get a grip on where are we,

25  where the Government is, where the defense is on looking at its

1  privilege materials.

2      And, you know, maybe you can just go ahead and try to

3  address all aspects of this.  You know, as I understand it,

4  there's this big universe that the filter team still has.  If

5  there's *Brady* material in that, I guess the Government has to

6  produce it.  So all of that is going to have to be looked at.

7  If that's not so, you know, help me understand that.  And, you

8  know -- so...

9          **MR. ABRAMS:**  Thank you, Your Honor.  I may be able to

10 start, if that's okay.

11         **THE COURT:**  I don't care.  Whoever.

12         **MR. ABRAMS:**  The Government is -- we've had a great

13 working relationship with them on this issue, so where we are,

14 from our perspective, is that we have a subset of material that

15 has -- that has been produced to us that has also been produced

16 to the prosecution team, and then there's a subset of material

17 that the filter team has and has produced to us but has not

18 produced to --

19         **THE COURT:**  That's potentially privileged?

20         **MR. ABRAMS:**  Yes, Your Honor.

21         **THE COURT:**  Huh-uh.

22         **MR. ABRAMS:**  And so --

23         **THE COURT:**  And there's the other material that none

24 of you have seen.

25         **MR. TYNAN:**  No.

1      **THE COURT:**  No?

2      **MR. ABRAMS:**  I believe we have everything that the

3  filter team for the Government has.

4      **MR. TYNAN:**  So the prosecution team at arraignment

5  produced everything that the Government had -- the prosecution

6  had, and then at the same time that the filter protocol order

7  was entered by the Court the filter team produced everything

8  that was on the filter side to the defense.  The prosecution

9  team has not seen that information because of the potential

10  privilege issue and thus the need for the filter protocol

11  order.

12      **THE COURT:**  Okay.  I'm sorry.  Let me back up.  Let me

13  find what I thought the facts were because maybe I have totally

14  misunderstood something.

15   I understood that the Government had 19 million documents

16  and that after arraignment they gave -- these are rough --

17  two million documents were produced and y'all have those.  So

18  that means the filter team still has 17 million documents.

19      **MR. TYNAN:**  So that is correct up until the last part.

20  The filter team has produced the 17 million documents to the

21  defense.

22      **THE COURT:**  Oh.  Okay.

23      **MR. TYNAN:**  Just not to the prosecution.

24      **THE COURT:**  Okay.  Great.  Because I thought I

25  understood that there were some third parties who had privilege

1  issues.  But as far as y'all know, that's not right?

2          **MR. TYNAN:**  As far as I know, that's not an issue.

3          **THE COURT:**  Okay.

4          **MR. ABRAMS:**  We agree with that.

5          **THE COURT:**  All right.  Good.  Well, I'm so relieved.

6  I thought that there was this -- I mean, I knew that the filter

7  team had made available to the defense everything that

8  potentially the Defendant had a privilege to claim in, but I

9  thought there was stuff the Defendant had no privilege but

10  third parties might have a privilege, but not -- that's not

11  right.

12          **MR. TYNAN:**  My understanding is that everything on the

13  filter team side of the case has been produced to the defense.

14          **THE COURT:**  Okay.

15          **MR. TYNAN:**  I confirmed that before coming down to the

16  hearing because I knew that question would be asked.

17          **THE COURT:**  Right.

18          **MR. TYNAN:**  So that is my understanding.

19          **MR. ABRAMS:**  That's ours as well.

20          **THE COURT:**  Okay.  Great.  And so -- and it sounds

21  like the Government -- I guess the filter team -- I don't

22  know -- has assisted the defense with some word searches, at

23  least to some extent?

24          **MR. ABRAMS:**  They have, Your Honor, and our hope is

25  that our agreement with the Government that mooted the

1  suppression motion will also -- and we were -- we need to ask

2  Your Honor if we can do this -- would allow us not to have to

3  do the filter -- the privilege review at all.  We have access

4  to the material.  We can search it for exculpatory information.

5       So we think that there's not a need for the prosecution

6  team to do its own *Brady* review of that material because it

7  doesn't happen -- there's no obligation for them to do it.  We

8  have it.  We can look at it.  So that would obviate the need

9  for us to do first a privilege review and then have it filter

10  back to get to the prosecution team --

11            **THE COURT:**  But -- okay.  And is -- the Government

12  doesn't feel like it needs to see anything unprivileged?

13            **MR. TYNAN:**  So our agreement with the defense is if

14  the defense was going to use, summarizing -- paraphrasing here,

15  going to use something at trial, they would give it to us in

16  reciprocal discovery, and we would have the opportunity to

17  then, you know, conduct searches for related information.

18       But the general consensus among the parties -- and,

19  obviously, the defense can correct me if I'm wrong -- is that

20  whole universe of documents is unlikely to be used at trial,

21  hence the agreement in order to be a little bit more efficient

22  in the discovery process.

23            **THE COURT:**  Okay.  I think I've got it.  Okay.  This

24  is, like, very reassuring, and if -- if -- it seems, then,

25  unlikely we're going to have any privilege issues arise because

1  the Government is basically saying, as to these 17 million

2  documents, "We don't even want to see them unless you're going

3  to use them at trial."

4      **MR. TYNAN:**  Correct.

5      **THE COURT:**  You're agreeing if you're going to use

6  them at trial, you'll make them available and cooperate with

7  them in any follow-up requests they might have for related

8  documents?

9      **MR. ABRAMS:**  Yes, Your Honor.

10     **THE COURT:**  All right.  Good.  And everything has been

11  made available?

12     **MR. TYNAN:**  Yes, Your Honor.

13     **MR. ABRAMS:**  That's our understanding, yes,

14  Your Honor.

15     **THE COURT:**  Okay.  And you've got it all in searchable

16  format, the two million they produced right after arraignment

17  and then they supplemented -- I think you gave a few things.

18  And I assume you will from time to time additionally supplement

19  if you do a witness interview or something -- something like

20  that.  You could have a supplement, not documents.  You're not

21  anticipating any new groups of documents coming to you or

22  subpoenas or anything like that?

23     **MR. TYNAN:**  So -- just so we're clear, we did -- after

24  the Defendant filed its motions in this case, in our response I

25  said I think that there were two grand jury transcripts

 1  outstanding, one of which was a witness, one was noncivilian.
 2          THE COURT:  One of which?
 3          MR. TYNAN:  Was an agent presentation.
 4          THE COURT:  Was an agent?
 5          MR. TYNAN:  Yes, agent presentation.
 6      And we've made -- I just went ahead and produced the
 7  witness testimony for the grand jury, as well as the exhibits.
 8  So that was the last outstanding piece, from the Government's
 9  view, in terms of discovery made available for trial.
10      The other item I would like to -- maybe it's not
11  appropriate to get into this, but in connection with the
12  motions, the Government did make available and provided the
13  defense with what we call notable documents, which are
14  approximately 85 documents that the Government, at least in the
15  Government's view, deems to be important, critical to the case,
16  and just identified those, provided it in hard copy in a binder
17  for the defense.
18          THE COURT:  Those would be all or mostly inculpatory,
19  I assume.  Would that be fair?
20          MR. TYNAN:  I think it depends on who you ask,
21  Your Honor.
22          THE COURT:  Okay.
23          MR. TYNAN:  Definitely from the Government's view, I
24  think most, if not all, of that is inculpatory, so that is a
25  fair way to say that.

1    And then Your Honor mentioned that, of course, in the midst

2  of trial prep, when we interview witnesses, you know, naturally

3  reports were created.  My practice -- or our practice has been

4  to produce those reports as soon as they're available to the

5  prosecution team, and we'll do that.  We do not anticipate --

6  we don't have any trial subpoenas, as far as I know, that are

7  outstanding.  We don't anticipate subpoenaing more documents.

8  I -- that might happen.  To the extent that happens, I'm happy

9  to let the defense know.

10    The one thing I will say is the -- sometimes the SEC sends

11 us documents pursuant to the access request, and the practice

12 in this case has been to, once we get the documents from SEC,

13 just to turn them over.  I don't know of any forthcoming

14 productions from the SEC, but I'm just throwing that out there.

15        **THE COURT:**  Do I remember correctly that the SEC

16 proceedings have been stayed?

17        **MR. TYNAN:**  Yes, Your Honor.

18        **THE COURT:**  Okay.  I remember the civil case was

19 stayed, and I thought that I remembered that about the SEC,

20 which is pending, like, in Nevada.  Where is it?

21        **MR. TYNAN:**  In Nevada, yes.

22        **THE COURT:**  In Nevada.  Okay.  All right.

23    And did I cut you off?

24        **MR. TYNAN:**  No, Your Honor.  I believe that was all I

25 had to add with respect to discovery.

1      **THE COURT:**  Okay.  And Mr. Abrams or --

2      **MR. TOPETZES:**  Your Honor, I just wanted to ask for

3  one clarification.

4      **THE COURT:**  Stand close in front of the mic, and just

5  to ensure I do not unintentionally mispronounce your name,

6  please tell me again.

7      **MR. TOPETZES:**  My name is Steve Topetzes.

8      **THE COURT:**  Okay.  Topetzes.  Got it.

9      **MR. TOPETZES:**  I just wanted to clarify one of the

10  statements by the prosecution.  Mr. Tynan spoke to possible

11  additional witness interviews and reports of those interviews

12  being prepared.  I believe he said -- his practice would be to

13  share those with the prosecution team.  I just wanted to

14  clarify he meant he would share them with defense counsel.

15      **MR. TYNAN:**  Of course.  We would turn them over to

16  defense.

17      **THE COURT:**  Yes, that's certainly the practice in this

18  district.  I see Mr. Chut sitting there.

19      **MR. TOPETZES:**  Thank you, Judge.

20      **THE COURT:**  We're all -- everything has been turned

21  over, with the possible exception of anything else that comes

22  from the SEC, which seems unlikely, and a witness statement

23  here or there as we get closer to trial, whenever that is,

24  right?

25      **MR. TYNAN:**  Yes, Your Honor.

1    **MR. ABRAMS:**  That's our perspective as well.

2    **THE COURT:**  Okay.  And so the -- and the Defendant,

3  obviously, has a lot to go through, but since you now don't

4  have to go through the 17 million documents and to turn

5  16 million of them back over to the Government, you only have

6  to go through them for your purposes, that's a much more

7  manageable task than what potentially it was three months ago.

8    **MR. ABRAMS:**  Yes, Your Honor.  Doing it twice would be

9  more than twice as difficult.

10    **THE COURT:**  I'm not trying to say it's a small task.

11  I'm just saying it's not as big as it was.

12    **MR. ABRAMS:**  Absolutely.

13    **THE COURT:**  All right.  So unlikely to be any

14  privilege issues that I have to deal with, which I think the

15  deadline for that is, like, next week, but doesn't -- that's

16  not anticipated?

17    **MR. TYNAN:**  No, Your Honor.

18    **THE COURT:**  And nobody is expecting any -- any

19  problems in this area, it sounds like.  Okay.  All right.

20  Good.

21    So -- so, you know, that kind of takes us into the motion

22  to continue and scheduling and deadlines.  You know, I have to

23  say I'm not too keen on continuing it to May.  That's a really

24  long time in this district.  Also, I actually can't try it in

25  May because of what I already have set for trial in May, and --

1  you know, they're civil cases, and I know this is criminal and,

2  in my view, takes priority over civil.  But, you know, unless

3  we just can't try it before May, I don't want to wait that

4  long.

5      And so I'm -- you know, I want to be sure that we have

6  enough time to get ready because I certainly want y'all to be

7  organized, because things go better when everybody is

8  organized.  But, you know, I just had a pretty bad experience

9  in a patent case where I gave people plenty of time where they

10 rewarded me by filing a bunch of junk.  That's what I said to

11 the lawyers.  I got very irritated with them about it.  They

12 did not use the time to actually get ready and focus.  They

13 used the time to paper the case.

14     Now, y'all are criminal lawyers and, generally speaking,

15 criminal defense lawyers don't do that.  But, you know, I don't

16 want 8,000 motions in limine.  You know, I'm not giving you

17 extra time to just file 8,000 motions in limine and for me to

18 say about 7,995 of them, "Deferred until trial."  So, you know,

19 I want to be sure we're really being efficient with our time

20 and getting things done on a schedule that's manageable, but,

21 you know, that we're not just stretching it out.

22     And I'm also concerned because the Defendant told me in the

23 pre-indictment delay motion that the Defendant has some form of

24 dementia, which I didn't actually see any evidence to support

25 that, but we'll talk about that.  But -- so -- and delay

1 impacts his ability to get ready for trial, but now you want
2 more of a delay. So I'm actually a little bit more concerned
3 about that too.

4     Now, the times that I can try this case that interfere the
5 least -- I mean, you know, if y'all need a little more time,
6 you know, I don't mind giving you a little more time. I would
7 like to -- I can try it in December if we try it on December --
8 you know, I don't -- 13th, you know. That gives us five trial
9 days, plus maybe a couple of days into the next week. I don't
10 know how long y'all are thinking this case might take to try.
11 I mean, I could start the week before that.

12     Did I give you a specific date? Let me look now. I have
13 this all written down. December -- oh -- 13th. I did. Okay.
14 December 13th. And I can still do that.

15     I have arranged, you know -- as y'all know, we have this
16 sort of nutty system in this district -- I say "nutty"; it
17 works very well, but it is very unusual -- where we typically
18 don't assign cases to judges, except in trial terms, but I was
19 not going to deal with all these motions and then ask somebody
20 else to try the case. So as we also do fairly typically in
21 this district after, more normally, a motion to suppress is
22 heard, the judge just keeps it and schedules it for trial. So
23 that's what I've done with the clerk's office. So y'all are
24 struck with me, and I am stuck with you.

25     So I can still try it in December if y'all think we can be

1  ready in view of some developments since we briefed everything.

2  I can try it January 24th. Now, I appreciate all the conflicts

3  everybody has, but, you know, I don't really think it's

4  reasonable to ask for all -- you know, if a civil law -- if a

5  lawyer has civil hearings, I may not be able to accommodate all

6  of those. You're just going to have to say, "Well, somebody

7  else is going to have to take my civil case," or "Somebody else

8  is going to have to come in and do my part in this criminal

9  case," or "I'm going to have to play a background role, a

10 support role." Because I appreciate both the new lawyers in

11 the case here have apparently had some ongoing involvement and

12 has some historical knowledge that is likely to be helpful to

13 Mr. Reifler, but, you know, I can only do what I can do.

14      Now, if we have to go out further than that, you know, we

15 can talk. And I forget -- somebody's wife is having a baby.

16 Who is that? You. All right. And you just -- your wife just

17 had a baby?

18           **MR. ABRAMS:** Yes, Your Honor.

19           **THE COURT:** Lots of babies. Congratulations.

20           **MR. ABRAMS:** And thank you very much for moving the

21 hearing.

22           **THE COURT:** Well, I don't like continuances, but

23 that's a pretty good reason.

24      So I don't know -- what do y'all think? Let me just ask

25 the Government first.

1    How long is it going to take to try the case?

2         **MR. TYNAN:**  Your Honor, I --

3         **THE COURT:**  From your perspective.

4         **MR. TYNAN:**  From our perspective, case in chief

5  probably -- going full days -- full trial days --

6         **THE COURT:**  That's how I do it.

7         **MR. TYNAN:**  I just didn't want to assume that.

8         **THE COURT:**  That's how I do it, full trial days.

9         **MR. TYNAN:**  Seven to ten days at the most.

10        **THE COURT:**  Okay.  Well, that actually probably makes

11 it almost impossible to try it on December 13th.

12        **MR. TYNAN:**  I was going to mention that we'd bump into

13 the holidays, which naturally makes it difficult, at least in

14 my limited experience, to pick a jury.

15        **THE COURT:**  It makes it very difficult to pick a jury,

16 and I have extensive experience.  So -- all right.

17    And then I know the defense may not completely know at this

18 point, but what are y'all -- are most of your witnesses going

19 to be examined on cross-examination, you know, called by the

20 Government, or -- or are you thinking you'll affirmatively have

21 some evidence?

22        **MR. ABRAMS:**  I think we'll affirmatively have

23 evidence, Your Honor.  One of our main concerns, of course, is

24 figuring out how to get through these 17 million documents and

25 make sure we --

1          **THE COURT:**  You found all your exculpatory evidence?

2          **MR. ABRAMS:**  Yes, Your Honor.

3          **THE COURT:**  But in terms of --

4          **MR. ABRAMS:**  In terms of timing, my experience -- I've

5    never seen a defense case go more than two or three days.

6          **THE COURT:**  Me neither.  I mean, typically.  The last

7    one I tried the defense gave me 70 witnesses and then called

8    nobody.  So that is much more typical.

9       All right.  So two or three days at the most?

10         **MR. ABRAMS:**  Yes, Your Honor.

11         **THE COURT:**  Well, I do think that makes it very

12   difficult to try December 13th.

13      You know, jurors -- we've had very good luck in this

14   district trying cases in the pandemic, but it does take a full

15   day to select a jury because we have to do it in two parts.

16   You know, we bring 20 in in the morning, fill -- get however

17   many jurors we can get out of the 20, and then we bring a

18   second group in the afternoon and -- because we -- we'll

19   probably try it in Courtroom 1, which is -- it's a smaller

20   room, but it works better for jurors.  It's got a much bigger

21   jury box.  So -- and it also has closer access to the space we

22   have to use for the jury room.  Our existing jury room is not

23   big enough for -- so we've got some other space.  So we've been

24   trying cases -- criminal cases in this district in Courtroom 1.

25      I did back last summer look at trying some in this

1  courtroom, and I did figure out a way that I could do it.  It

2  involved the tables being side by side for the prosecution and

3  the defense here facing the jury here, and many jurors in the

4  floor coming out -- you know, coming out into where Mr. Chut is

5  sitting and even forward a little.  But it's not ideal because

6  the jurors end up -- the witnesses end up pretty close.

7      And we've tried -- I don't know -- between Judge Osteen and

8  me, four or five down there.  So it's worked pretty good.

9  But -- and the last time I did it, I do think we probably could

10 have gotten opening statements in after we selected the

11 second -- you know, the rest of the jurors in the afternoon

12 bunch.  We didn't do that, but I think I'm going to do that

13 from now on.  I'm going to have the morning jurors come back,

14 and we're actually going to get them impaneled and do the

15 opening statements in the afternoon, or at least hope for that.

16 But that still means, you know, you don't start the evidence,

17 so -- until the next day.

18      So even if the Government takes five days, which it's also

19 my experience that people overestimate how long trials are

20 going to take, and -- when it comes down to it, they get more

21 discerning about what is important.  But even if you take five

22 days, that still puts us into the holiday weeks, and, you know,

23 you don't want the jury sitting there having a *Miracle on 34th*

24 *Street* kind of experience, of needing to go take care of --

25 take care of things associated with get-togethers.

1    Everything does take a little longer with the pandemic.

2  I'm kind of assuming in December and even January we're still

3  going to be coping with it, whether it's worse or better than

4  now.  And everything does take a little bit longer, not much

5  longer other than jury selection, but it does take a little bit

6  longer.

7    So if we need to continue to January 4th, I'm okay with

8  that.  And I think when I looked at conflicts, if it takes a

9  couple of weeks, then that would finish up in time for

10 Mr. Abrams to get ready for his murder trial.  And with all due

11 respect to the state courts, where I worked for many years,

12 those dates are shifting and -- and it's in Durham?

13      **MR. ABRAMS:**  Yes, Your Honor.  We have a special judge

14 sitting just for this case.

15      **THE COURT:**  Assigned?

16      **MR. ABRAMS:**  Yeah, there's five --

17      **THE COURT:**  Defendants?

18      **MR. ABRAMS:**  Five trials.  The judge severed --

19      **THE COURT:**  Excuse me?

20      **MR. ABRAMS:**  -- Judge Beecher Gray, and so we're

21 having -- there are five trials that are going to go back to

22 back.  For whatever reason, the prosecution wants to do our

23 client first.  But I think if Your Honor were to set this case

24 in February, for example, I could ask Judge Gray to move the

25 trial.

1          **THE COURT:**  Well, you know, I try to get along with

2  state court judges.  I don't try to pull rank on them too

3  terribly much, but I also know that state court trials have a

4  way of moving or resolving.  And it looked like we had some

5  arbitration proceedings and -- you know, and then I guess

6  Mr. Kornobis has parental leave early 2022, a little unsettled.

7      You know -- but on the other hand, we have a speedy

8  trial -- we've got the need to be sure we get the case resolved

9  expeditiously while still fairly.  I am concerned about what

10  the -- what the Defendant has said about his health situation.

11  You know, it doesn't -- we'll get to the pre-indictment delay

12  later.  I have some pretty serious questions about whether it's

13  sufficient to show prejudice, but, you know, there we are.

14      You know, so what do y'all think?  Do you have the

15  17 million documents in searchable form?

16          **MR. ABRAMS:**  We do, Your Honor.

17          **THE COURT:**  Okay.  And a lot of them are bank records,

18  I assume.

19          **MR. ABRAMS:**  I'm not --

20          **THE COURT:**  I guess the bank records wouldn't have

21  potentially been privileged.

22          **MR. TYNAN:**  No, Your Honor.  The bank records are

23  voluminous.  I don't disagree with that.

24          **THE COURT:**  Yeah, but there would -- it's hard to see

25  how they could potentially be privileged.  But in any event, I

 1 don't know what kinds of documents you have got your hands

 2 around, but the exculpatory ones are likely to be ones your

 3 client actually probably has some idea about generally, if not

 4 specifically.  I'm just --

 5          **MR. ABRAMS:**  I think that's largely true.  It's just a

 6 matter of doing word searches.  There's a lot of emails.  You

 7 know, we know what we think happened here, and so we'll work to

 8 put the leaves on the tree, if you will, with documents.

 9          **THE COURT:**  And you've had these since early August?

10          **MR. ABRAMS:**  I'm deferring to Mr. Kornobis.

11          **MR. KORNOBIS:**  Yes.

12          **THE COURT:**  Shortly after arraignment.

13          **MR. ABRAMS:**  And this hearing has been helpful in

14 terms of us understanding where we need to dig in and how -- a

15 lot of the issues that we've had is just what is it; that if we

16 shop it, we -- we win, right?

17          **THE COURT:**  Right.

18          **MR. ABRAMS:**  And so I think understanding those five

19 buckets, assuming the Government is -- that that's what their

20 case is, now we've got some idea, assuming Your Honor allows

21 the case to move forward.

22          **THE COURT:**  Which I have to say I'm very inclined to

23 do, but we'll -- I'm going to listen to everything before I

24 make up my mind finally.

25          **MR. ABRAMS:**  But if -- you know, I think that gives us

 1 | some more direction.  We do hope the Government is bound by
 2 | those five buckets so that we know, you know, what we're
 3 | defending against if that's how we move forward, but with that
 4 | it is easier to prepare so we know what specifically to look
 5 | for.
 6 |      **THE COURT:**  So, I mean, if -- you've had everything
 7 | since August, right?
 8 |      **MR. TYNAN:**  April, Your Honor.
 9 |      **THE COURT:**  April.  April.  I'm sorry.  April.  Gosh,
10 | I said that totally backwards.  What was I thinking happened in
11 | August?
12 |      **MR. ABRAMS:**  I think we got the 17 million in August.
13 |      **MR. KORNOBIS:**  I believe we got --
14 |      **THE COURT:**  Yeah, the mic.  Is it on?
15 |      **MR. KORNOBIS:**  I can shout.  Yeah, I believe after the
16 | arraignment and filter protocol was entered, then we received
17 | the 17 million, but pieces of that have also been reduced after
18 | word searches that have been more of a priority focus under the
19 | filter protocol.  But the full 17 million -- I don't have the
20 | date of the protocol, but I believe it was shortly after that.
21 |      **MR. TYNAN:**  May 13th.
22 |      **THE COURT:**  Oh.  All right.  Thank you for -- I don't
23 | know where I got August in my head.  So you've had it several
24 | months already is kind of my point.
25 |     Do -- do y'all want to see if we can talk briefly about the

1  *Brady* -- well, we might -- maybe we should just talk about the

2  pre-indictment delay motion, and I can hear about the

3  prejudice.

4      Over the lunch break maybe y'all can talk a little bit

5  further between yourselves about trial.  You know, my other

6  date -- I don't want to do this, okay?  I don't want to wait

7  this long, but it is -- I could do it March 21st and 28th, you

8  know, those -- those two weeks in there.  That one is going to

9  cause me more problems.  Plus, it's further out, you know.  I

10  avoided February out of some deference to the state court and

11  the murder trial.

12      Mr. Kornobis, I suppose your leave is not completely

13  settled because nobody knows when the baby is actually going to

14  come.

15          **MR. ABRAMS:**  Your Honor, as to February, we have

16  some -- my cocounsel just had a trial set in Wake County in

17  January, so I think he's inclined to ask Judge Gray to move the

18  murder trial in light of that.  So if you have dates in

19  February that we could consider as we talk with the

20  Government --

21          **THE COURT:**  Well, I'm actually pretty open in

22  February, so -- or at least I think I am.  I usually like to go

23  someplace sunny in February, but -- for a few days, but, you

24  know, y'all aren't going to take the whole month.

25          **MR. ABRAMS:**  We would consent to a change of venue to

1  Hawaii.

2         **THE COURT:**  Virgin Islands, right.

3      So why don't y'all maybe talk about that at lunch a little

4  bit, and, you know, I think you're -- it does sound -- and I

5  very much appreciate y'all are working well together on

6  managing what's a fairly complicated administrative process,

7  you know, here, and see where we are.

8      You know, I wasn't completely sure, you know, on the motion

9  to continue if the Government -- it sounded like the Government

10  didn't object to the motion to continue, but I wasn't sure

11  exactly about the scope of that objection.

12         **MR. TYNAN:**  Your Honor, correct, the Government does

13  not object to the motion to continue.  We discussed the dates

14  that were going to be in there before the defense filed it.

15      The Government does not dispute that there's a ton of

16  evidence in this case.  It's not disputed.  And, you know,

17  while our versions of the facts are different, the Government

18  feels it's pretty straightforward.  The defense, obviously,

19  disagrees, and that can take some time.  So we're -- we're

20  willing to give the defense time that it needs to prepare for

21  trial.  It's, as Your Honor said, in both parties' interest to

22  have prepared counsel at trial, but we do want it to be a

23  reasonable continuance.  We haven't talked about the outer

24  bounds of what is reasonable, but we're happy to consult

25  further with defense counsel once counsel for the Government

1  can confer as well.

2      **THE COURT:**  And in terms of these motions in limine

3  that are in the proposed schedule -- so, you know, my original

4  order set August 6th as a deadline for any pretrial motions for

5  any party, which, you know, arguably covers motions in limine.

6      Now, you know, if y'all have a few, like, three -- I'm not

7  setting an outside limit, but I am not -- I know I don't want

8  to deal with things under the motion in limine box that ought

9  to just be deferred until trial because, you know, there's a

10  lot of stuff you can't tell until the trial happens.  If

11  there's big categories of things, okay, if there's one smoking

12  gun, you know, Defendant particularly wants to be heard on, I

13  don't mind a couple of motions, or something the Government

14  wants to be heard on.

15      But, you know, y'all are going to have to be reasonable if

16  I let you file motions in limine because I have been burned,

17  and it's not going to happen again.  So maybe y'all should talk

18  about that over the lunch break and see -- see where you are.

19      **MR. ABRAMS:**  Yes, Your Honor.  Thank you.

20      We talked about those other dates to make sure

21  Your Honor -- our -- I think, speaking for both of us, our

22  intention was to show Your Honor that we want to move the case

23  along and not show up in May and say we haven't --

24      **THE COURT:**  Right.  I appreciate that.  I don't want

25  to deal with motions in limine or housekeeping matters when

1  we're picking a jury, so I would anticipate having y'all back

2  in a few times before whatever trial day we pick.

3      And, you know, I -- I probably can try it in April, you

4  know, if you need a date in April.  You know, I want to be

5  flexible with you.

6      But let me hear -- if you can, Mr. Abrams, speak about my

7  concern about the claim that Mr. Reifler has some worsening

8  dementia.

9          **MR. ABRAMS:**  Yes, Your Honor.  So thank you.  We

10  have -- I believe Mr. Kornobis has the medical documentation of

11  that.  That should have been attached to our pretrial motion.

12      From our perspective, continuing it out does not risk

13  worsening the prejudice because he has worked with us.  We've

14  worked with him over the course of this case since it was

15  charged and understand what his memory is, and so I don't think

16  he's going to lose the relevant memory.  Of course, he doesn't

17  know what he doesn't remember, and that is terrifying for

18  people.  So it's a hard place to be as a criminal defendant,

19  I'm sure, if you know you have a condition that causes you not

20  to remember things, and then you've got to figure out how to

21  defend yourself.

22      So that's why we filed the motion to dismiss on this

23  ground, but I do not believe that the continued -- extending it

24  a few months is going to enhance that prejudice, Your Honor.

25          **THE COURT:**  So if you're proposing to give me the

1    medical records, that's fine, but I would need to have them
2    filed under seal, and the Government would need to see them.
3              **MR. ABRAMS:**  Yes, Your Honor.
4              **THE COURT:**  You know, so I take it you have not shared
5    them with the Government?
6              **MR. ABRAMS:**  We have not yet, but we will.
7              **THE COURT:**  But you will.  Okay.
8         Well, then in that case, does it make sense to go to lunch
9    now; let y'all -- you share the medical records, which would
10   be -- you know, obviously, the Government would not show them
11   to anybody else, and then I would let you file them with the
12   clerk under seal because medical records typically -- you know,
13   we don't make those available.  But, you know, I don't like to
14   do stuff with you handing it up and then I just hand it back to
15   you because then the Fourth Circuit can't review it.
16             **MR. ABRAMS:**  Yes, Your Honor.
17             **THE COURT:**  And then when we come back, y'all tell me
18   where you kind of are on the trial, and then we can move --
19   move forward with the *Brady* motion, the pre-indictment delay
20   motion, and then -- I don't actually think I need to hear from
21   you on any of the rest of the motions, unless there's something
22   key that somebody wants to point out to me that's not in the
23   briefs.
24        So how does that sound to everybody?
25             **MR. TYNAN:**  That's fine with us, Your Honor.  Thank

1  you.

2          **MR. ABRAMS:**  That sounds great to us.

3          **THE COURT:**  Okay.  I'll be back at 1:30.  Is that all

4  right?  It gives you an hour and a half -- I can give you until

5  1:45.  Do you want to eat and talk?

6          **MR. TYNAN:**  That's fine with us, Your Honor.

7          **THE COURT:**  Which one?  1:30 is perfect?

8          **MR. ABRAMS:**  Yes, Your Honor.

9          **THE COURT:**  Okay.  So during that time, y'all will eat

10  or not, as you choose, but you'll talk with each other about

11  trial dates; you'll share the medical records.

12      And in addition to trial dates, if there's anything, you

13  know, about the schedule otherwise then -- I might want you to

14  give me your jury instructions earlier than y'all were -- than

15  you proposed, Mr. Abrams, in your motion to continue.  You

16  know, given all our discussion this morning, you know, I

17  might -- I have other things to do from time to time, and it

18  might take me a little longer to get through that to be sure

19  I'm ready for the trial, though y'all have helped, obviously, a

20  great deal here this morning.  So we can talk about the

21  details.

22      Okay.  All right.  We'll be in recess until 1:30.

23      (A noon recess was taken from 12 p.m. until 1:30 p.m.; all

24  parties present.)

25          **THE COURT:**  All right.  Good afternoon.

1     **MR. TYNAN:**  Good afternoon, Your Honor.

2     **THE COURT:**  So we've covered the discovery status.

3   And what do y'all think about a trial?  Did you come to an

4 agreement, or do I just need to set a date?  Or just tell me

5 when you think is best if you're not completely agreeing given

6 that I can't really do it in May.

7     **MR. ABRAMS:**  Yes, Your Honor.  So I think we are in

8 agreement that either -- the second half of February or March,

9 that time frameworks for both of us.

10     **THE COURT:**  Both of you?

11     **MR. TYNAN:**  Yes, Your Honor, that works for us.

12     **THE COURT:**  Okay.  And you believe you'll be able,

13 Mr. Abrams, to coordinate with the state court about your

14 murder trial?

15     **MR. ABRAMS:**  I do, Your Honor.  I called my office.

16 And I actually -- I'm glad I did because they informed me I had

17 an Eastern District trial set for January 24th that was just

18 set.  So -- but I think with all that's going on and all the

19 other defendants, they can find somebody else to try during

20 that slot, I hope.

21     **THE COURT:**  All right.  So it looks like February 21st

22 is Presidents' Day, so that means that's a holiday, right?

23 Ms. Winchester is agreeing with me.  But that -- you know,

24 that's all right.

25   If we start it on Tuesday, the 22nd, got jury selection and

1 opening statements done -- I'm going to assume that what will
2 happen in this case is what will happen in most cases, and, you
3 know, it will go a little faster than expected.  Or we can
4 start the -- we can start the 28th.
5     Anybody care particularly between those two?
6         **MR. TYNAN:**  Your Honor, if possible, is there any
7 possible way to do, like, middle of February, only because of a
8 conflict the beginning of March?
9         **THE COURT:**  I'm sorry.  Say again.
10         **MR. TYNAN:**  Only because of a conflict at the very
11 beginning of March for my trial counsel.
12         **THE COURT:**  Oh.  Okay.  Well, I mean, if we start on
13 the 14th, then, you know, we'll have an extra day off, but, you
14 know, that's good.  We'll pick the jury on the 14th.  We'll get
15 all the evidence in on the next four days.
16         **MR. TYNAN:**  Yes, exactly.
17         **THE COURT:**  Maybe not, but -- I mean, how does that
18 look for the Defendant?  As good as any other time?
19         **MR. ABRAMS:**  The 14th works for us, Your Honor.
20         **THE COURT:**  All right.  Let's move it then to the
21 14th -- February 14th, and then we can work backwards from
22 that.
23     I think y'all are amenable to exchanging preliminary
24 exhibit and witness lists December 1st -- December 1st?  That's
25 two months before, two and a half months.  That's generally in

 1 line with what Mr. Abrams had proposed in the motion to

 2 continue.  Or do you want to do it December 14th?

 3          **MR. ABRAMS:**  I'd say we would prefer the 14th,

 4 Your Honor.

 5          **MR. TYNAN:**  Your Honor, if we could push it back to,

 6 like, the first week of January.

 7          **THE COURT:**  Well, that's fine as long as y'all can

 8 brief the motions in limine quickly.

 9          **MR. TYNAN:**  Well, with Your Honor's admonition that we

10 shouldn't be filing too may in the first place --

11          **THE COURT:**  That's true.

12          **MR. TYNAN:**  -- I don't think that's going -- at least

13 for the Government, will be an issue.

14          **MR. ABRAMS:**  We're fine with pushing it back.

15          **THE COURT:**  How about you file -- you exchange that,

16 then, January -- I don't know whether New Year's Day holiday

17 is -- I guess the 3rd is not a holiday, is it, of 2022?  No.

18 All right.  January 3rd?

19          **MR. TYNAN:**  That's fine, Your Honor.

20          **THE COURT:**  Okay.  January 3rd.  And then the motions

21 in limine January 10th, responses January 17th, and -- you

22 shouldn't need any replies because y'all will -- y'all will

23 talk before filing a motion in limine.

24          **MR. TYNAN:**  Yes, Your Honor.

25          **MR. ABRAMS:**  Yes.

1        **THE COURT:**  So everybody will kind of know, so you

2   shouldn't need a reply.  And then trial briefs, joint jury

3   instructions January -- can you do that -- I'd really like the

4   instructions at least by January 24th -- is that manageable? --

5   and the trial briefs then or a week later, as you prefer.

6        **MR. TYNAN:**  Yes, Your Honor.

7        **MR. ABRAMS:**  That works for us.

8        **THE COURT:**  All right.  So you want the trial briefs a

9   week later?

10       **MR. ABRAMS:**  Yes, Your Honor.

11       **THE COURT:**  Okay.  Trial briefs January 31st, jury

12  instructions January 24th.

13      Now, for the voir dire, what I would anticipate is we'll

14  just have a pretrial conference sometime in January, and y'all

15  just tell me.  But, you know, I've been picking juries for

16  quite a while and overseeing juries quite a while, and I

17  believe Mr. Chut will tell you I'm very thorough in the

18  questions that I ask.  But, you know, y'all will know a lot

19  more about the case, obviously, than I will, so I'll probably

20  miss a few things.  But I'll go over with you what I intend to

21  cover, and then y'all can supplement.  But, you know, I don't

22  ask them things like the bumper stickers on their cars because

23  I don't think that really bears on their fairness.  But, you

24  know, we can talk again, and then we'll do the trial -- start

25  the trial on the 14th.

1   So with the expectation, you know, that we'll be able to

2   try it in two weeks, hopefully -- and, you know, y'all can keep

3   me advised on that.  If it looks like it's going to go into the

4   third week, which I know is a potential based on what you have

5   told me so far, but -- you know, when it comes down to it,

6   usually -- people usually narrow and focus and decide to think

7   of the jury when presenting their evidence.  But we'll talk

8   about that further.

9       And then -- let me see.  Would it -- I might just -- I'm

10  trying to think when I need to see you again.  There -- there

11  would not seem to be any need to schedule anything until after

12  I get, certainly, the motions in limine and probably the jury

13  instructions.  So -- I mean, depending on how far in -- what

14  the motions in limine turn out to be about, if any, and what

15  you need -- you know, you really need to do your last bit of

16  trial prep.  I mean, we could just do it the Friday before the

17  trial starts, or I could find, you know, a day a little

18  earlier.  So y'all might consult your specific calendars after

19  court today and get back to the case manager.

20      You know, if we leave it too close to the trial, then we'll

21  have all kinds of conflicts, and I just work better if I have

22  it on my calendar, and then nothing else will be more important

23  than you on that day.  If we don't need to have it, then, you

24  know, we can cancel it.  So depending on how complicated it is

25  and the virus situation, we might could do it by Zoom if

1  everybody was agreeable.  But we can talk about that closer to
2  the time.
3      All right.  So if y'all will consult about a date in late
4  January or February for a final pretrial conference and let --
5  give Ms. Winchester a couple of days that work for everybody
6  by, say, Monday.  That would be helpful.  You'll be able to get
7  your witnesses all lined up.
8      Now, if there should be any unexpected complications,
9  please let me know immediately because scheduling during the
10 pandemic, you know, which we haven't even really talked
11 about -- but scheduling for the Court during the pandemic is --
12 has extra complications.  So please let me know immediately.
13     And if anything else happens about resolving the case, let
14 me know that too immediately, and I'll get you on my calendar
15 whenever I can.  I should be able to do that quickly if -- if
16 that should happen.  But, you know, I don't intend to say
17 anything else about a nonjury resolution because that is
18 completely up to y'all, so -- other than to tell you I can
19 schedule it pretty quickly should that happen and to encourage
20 you to tell me as soon as it happens so I can release the --
21 you know, my trial days, you know.  So the scheduling things,
22 that's all I really have to say about that.
23     Anything else about the motion -- so I'll grant the motion
24 to continue in part and continue it until February 14th and --
25 with the scheduling deadlines I have set.

1        Anything else about scheduling I need to address?

2            **MR. ABRAMS:**  Not from our side, Your Honor.  Thank

3    you.

4            **MR. TYNAN:**  Your Honor, one thing.  I think we talked

5    about suspending the filter protocol order, and I think we

6    needed to formally request the Court to do that so that neither

7    party is potentially violating the order by doing that.

8            **THE COURT:**  Oh.  Right.  So what exactly do you need

9    me to say?

10           **MR. TYNAN:**  That both parties agree that the filter

11   protocol order is suspended -- I think that accomplishes it --

12   until further notice by the Court.

13           **THE COURT:**  Does anybody have the docket number right

14   in front of them?

15           **MR. TYNAN:**  I believe it's --

16           **THE COURT:**  21?

17           **MR. TYNAN:**  21, yes, Your Honor.

18           **THE COURT:**  All right.

19       Is that what you also think, Mr. Abrams?

20           **MR. ABRAMS:**  Yes, Your Honor.  Thank you.

21           **THE COURT:**  The Court -- the parties agree that the

22   filter protocol order, Docket 21, should be suspended.  So the

23   Court -- and given what everybody has told me about the case,

24   that's appropriate.  The Court will suspend the filter

25   protocol -- the requirements of the filter protocol order,

 1  subject to further order of the Court and -- you know, on

 2  motion of the parties or notice by the Court.

 3      Anything else about scheduling, housekeeping-type matters

 4  before we turn to the last few substantive matters?

 5          **MR. ABRAMS:**  Not for Mr. Reifler.

 6          **MR. TYNAN:**  Nothing for the Government.

 7          **THE COURT:**  Okay.  So I have next on my list the two

 8  very related motions for identification of the *Brady* --

 9  specific identification of the *Brady* material and the

10  Defendant's motion for a list of trial exhibits or to at least

11  narrow what -- identify what the Government wouldn't use.  Some

12  of this I think has probably gone away.

13      Has all of it gone away?

14          **MR. ABRAMS:**  So, Your Honor, certainly the

15  identification of documents we think is moot -- has been mooted

16  by the schedule.  We'll withdraw that request.

17          **THE COURT:**  All right.

18          **MR. ABRAMS:**  Also by the Government producing its hot

19  docs.  That was really helpful, and we appreciate it.  So we

20  would withdraw that request.

21      On the *Brady* motion, our -- what we're asking for we think

22  is pretty limited; and that is that we just want to know if the

23  Government, in their review, has identified documents that they

24  believe constitute exculpatory information; and if so, we're

25  asking that they identify those with specificity for us.

1      The basis for that, Your Honor, is, from our perspective,

2   the purpose of *Brady* is to make sure that the Defendant finds

3   exculpatory evidence that the Government knows about; and if we

4   have two million -- now we're down to two million.  We made

5   this motion in the context of 19 million, but we still have

6   two million, I think, pages of documents.  And so we think that

7   the general purpose of *Brady* is best accomplished by requiring

8   the Government to let the defense know of -- with specificity

9   of exculpatory information that it has identified.

10      So, for example, if they have a file or notes that indicate

11   that they have identified exculpatory information, that they

12   should have to say to us, "Here is where it is," not it's

13   within two million pages of stuff, and -- so that's the

14   basis -- the basic premise that we're asking the Court to

15   adopt.

16      I don't know whether the Government has identified any of

17   that, and I think a lot of this turns on just them making a

18   representation one way or the other about it, from our

19   perspective.  We don't intend to make a big deal out of this.

20   We just want to not have to go and do a needle-in-a-haystack

21   review for items they have already identified.

22      We intend to go and do our own review.  We're not intending

23   to just rely on what they tell us about, you know, from their

24   perspective of what's exculpatory; and, of course, we may find

25   certain things to be exculpatory that they don't think is

1    exculpatory.  We understand all that.

2        So we're not trying to create some problem for the

3    Government.  We're just asking that if they've identified

4    exculpatory evidence that they identify it for us with

5    specificity within the production instead of saying, "Well,

6    we've turned over two million pages, and everything we've

7    identified as exculpatory is in there."

8            **THE COURT:**  Okay.  And did you read *Strickler* the

9    same -- that footnote?  I think -- I don't know.  Is that

10   Justice Breyer?  He's always putting stuff in footnotes that

11   end up being, like, kind of important down the road.  That may

12   not have been him.

13       You know, that footnote definitely says that in the normal

14   *Brady* context that defense counsel can rely on the Government's

15   representation of open -- you know, "I've produced open file.

16   You've got everything."

17       And -- and so I take it from what you just said that you

18   would not be contending that you'd be allowed to make that

19   same -- you know, have that same reliance on any list that they

20   gave you.

21           **MR. ABRAMS:**  That's right.

22           **THE COURT:**  But do you also read that footnote in

23   *Strickler* as -- as saying that, generally speaking, open-file

24   discovery complies with *Brady* obligations?

25           **MR. ABRAMS:**  Yes.

1     **THE COURT:**  Uh-huh.

2     **MR. ABRAMS:**  And, you know, our -- our review of the

3  cases we've cited in our briefing kind of provide some color to

4  that, I think, that says in a typical case when it's reasonable

5  to -- that the defense will necessarily find everything that's

6  exculpatory within the open file, that producing everything is

7  sufficient.

8     There's a spectrum; and I think that, from our perspective,

9  the question for the Court is where are we on the spectrum.  If

10  we had 19 million or 100 million pages, maybe it would be

11  different than two million, but we think two million is enough

12  to say if the Government has identified it, they should have to

13  point it out.  And that the *Strickler* concept applies probably

14  more in the 100,000-page context.

15     And really because we think that at the end of the day all

16  this is about is just making sure that the Defendant gets a

17  fair trial, which requires him and his team to know about the

18  exculpatory information in the file.  So we're really just

19  asking for the Government to help make sure that we do our job.

20  And we're going to do it too.  We just want to make sure we

21  don't miss anything.

22     **THE COURT:**  Okay.  Thank you.

23     For the Government?

24     **MR. TYNAN:**  Yes, Your Honor.

25     The Government's position is that it has satisfied and

1    adhered to its *Brady* obligations because it has disclosed the

2    information in its file through discovery; and *Brady* requires

3    disclosure, not necessarily the specific identification and

4    culling out of materials that are helpful to the defense when

5    that information has already been affirmatively disclosed to

6    the defense.

7        And the defense has cited a number of cases in their brief

8    where the Court, admittedly, did go further under those

9    specific circumstances in those instances, and those

10   circumstances are not present here.  For example, if you look

11   at the *Blankenship* case from the Southern District of

12   West Virginia, the Court noted that where the Government took

13   additional steps in its discovery practices that such relief

14   such as identifying *Brady* material in evidence that's already

15   been disclosed was not warranted.

16       And the Government has taken those steps here.  It's

17   produced discovery early; it's been voluminous; it has been in

18   accordance with district practice; and there's been no

19   assertion, at least on its face, that the Government is

20   intentionally burying *Brady* in its discovery productions,

21   knowing about it on the one hand and then just stuffing its

22   discovery on the other hand and trying to suppress it in that

23   way.  That hasn't happened here, and there hasn't been any

24   assertion that has happened here.

25       In the *Salyer* case that was also cited by the Defendant,

1  the defendant was in jail; circumstances not present here.

2  There was also no parallel civil litigation in that case.

3  There are two ongoing parallel civil litigation which the

4  Defendant is abundantly aware of and involved in and has been

5  for quite some time.  There's a civil case that's pending in

6  this court, and there's also the SEC parallel investigation in

7  which the Defendant himself has testified and produced

8  documents.  And the Court in that case specifically found that,

9  quote, the identification requirements of this case would"

10  apply to other cases not similarly -- "would not apply to other

11  cases not similarly situated in factual circumstances."  That's

12  at page 8.

13       So in addition, in that case the evidence that was at issue

14  not only included electronic evidence but also hard copy

15  documents that was stuffed in boxes and located in different

16  FBI offices.  That's not what we have here.  We're not making

17  the Defendant run around to different law enforcement offices

18  to look at that material.

19       In the *Saffarinia* case in the District DC court, the

20  defense counsel there was serving pro bono.  That's not what we

21  have here.  The Defendant has highly capable retained attorneys

22  from two law firms, both of which are respected both here in

23  North Carolina and nationally; and they do not have the same

24  pressures that, admittedly, pro bono counsel would have.

25  Again, in that case there was no parallel civil litigation;

1  here there is.

2      So the Government submits, Your Honor, that the

3  circumstances under which courts have found the Government to

4  go identify material that's already been disclosed are not

5  present here and are not warranted.

6          **THE COURT:**  Okay.  Thank you.

7      Any rebuttal?

8          **MR. TOPETZES:**  Your Honor, if we may be heard just

9  very briefly.

10     The relief we're requesting here is very narrow, and I just

11  want to put some of it in context and then make a reference to

12  *Strickler* and then some of the other cases that we cited, a few

13  of which Government counsel glanced against as part of the

14  opposition to the motion.

15     In *Strickler,* the circumstance was an ineffective

16  assistance of counsel argument, right?  The defense lawyer –– a

17  petitioner who had been convicted of capital murder and

18  sentenced to death in Virginia raised a concern with respect to

19  his predecessor counsel, predecessor counsel's acceptance of

20  the Government's representation.

21          **THE COURT:**  Yeah, exactly.  Most of the cases arise in

22  either that context or sometimes they're civil cases.

23          **MR. TOPETZES:**  Understood, Your Honor.

24          **THE COURT:**  Yeah.

25          **MR. TOPETZES:**  And the Court said, as you point out,

1  that acceptance in that circumstance of the Government's

2  representation was reasonable, although in that case some *Brady*

3  material was omitted, either inadvertently or otherwise, from

4  the production; and the Court determined that it wouldn't have

5  affected the outcome at the end of the day.

6      Our case is a little different, and we're seeking just very

7  narrow relief.  To the extent -- a number of courts have gone

8  further, as Mr. Tynan acknowledged and as we set forth in our

9  papers, to provide for additional comfort to defendants in

10 different circumstances.  Now, when we filed this motion, it

11 was against the backdrop of that 19 million dollar --

12 19-million-page document dump from the Government, but we're

13 still dealing with two million pages.

14     What we're respectfully asking, again, is very narrow.  We

15 understand there may be interpretive issues.  We're not seeking

16 to impose additional obligations on the Government, except to

17 this very limited extent, Your Honor, and that is to the extent

18 the Government has identified materials that it regards as

19 exculpatory, we ask them to identify those materials and to be

20 directed to do so, as opposed to saying, "We've produced

21 everything.  Have at it, Defendant."

22     We don't think that's burdensome; we don't think that's an

23 onerous or unreasonable request of the Government; and we're

24 asking for that very limited, we think, narrow relief, again,

25 to ensure the overall fairness from our perspective.

1    **THE COURT:**  Okay.  Let me take that under advisement

2  in the short run.

3    But I did want to come back to one thing that I forgot

4  about the schedule.  Just logistically speaking, we will need

5  final, or very close to final, exhibit lists, you know, at

6  least the week before trial.  You know, y'all will need to

7  exchange those.

8    You know, we'll do it all electronically in the courtroom,

9  and, you know, you'll have to come and work with our IT people

10 and be sure everybody is trained on our system and such.

11   But I -- you know, just -- this is not really a fairness

12 issue.  This is an efficiency issue.  Everybody -- I don't want

13 to stop the trial while one or the other of you looks at an

14 exhibit that the other side has not identified as an exhibit.

15 I mean, I don't mind doing it once, but I don't want to have to

16 do it repeatedly.

17   So a week before trial everybody should know what their

18 witnesses [sic] are and have them marked, stickered, on a flash

19 drive or however else the clerk tells you to do it.

20   Is there any problem with requiring that by February 7th?

21    **MR. TYNAN:**  Not from the Government, Your Honor.

22    **MR. ABRAMS:**  Not for the defense, Your Honor.

23 Obviously, we may need -- the defense may need to supplement

24 that more than the Government since we're responding throughout

25 the trial, but we'll endeavor to -- if we know we're going to

1 use something, as soon as we know that, even if it happens

2 during trial, we'll add it to the list.

3          **THE COURT:** Yeah.  I mean, I'm not going to be a jerk

4 with you about one or two things here or there, or if you say,

5 "Oh, my gosh.  We forgot these ten documents," and it's only

6 three days before the trial.  My main goal is to be sure the

7 trial is running efficiently and we don't have to stop a lot

8 during the trial, so that everybody has got a set and kind of

9 knows at least from that.

10     And then, of course, I'll need a final witness list to tell

11 the jury about during jury selection.  So is there -- is that

12 also going to be a week before?  Is that good?

13          **MR. TYNAN:**  That's fine with the Government,

14 Your Honor.

15          **MR. ABRAMS:**  That works for the defense as well.

16 Thank you.

17          **THE COURT:**  Okay.  Good.

18     And now turning -- I forgot to take -- to take into account

19 the issue I raised in -- well, when setting the schedule, we

20 did not return to the medical issues related to Mr. Reifler.

21 So, you know, as I hear about those -- if you want to say

22 anything else about it and if I need to reconsider the schedule

23 after -- if you're going to submit those medical records, you

24 know, I just wanted to kind of give myself that option.

25     Are you going to give me those, or what are you going to do

1 about the prejudice issue on the pre-indictment delay?

2     **MR. ABRAMS:** Your Honor, we have -- we've looked into

3 that extensively. We do have the -- we do have medical

4 documentation that establishes that he's for many years

5 suffered from this condition that we talked about.

6   We also read the Government's response and the cases that

7 indicate that establishing actual prejudice is a difficult

8 thing to do; and we've given Your Honor, I'd say -- and to --

9 just to make sure Your Honor understands where we were when we

10 filed this motion, we have documentation showing a PET scan, as

11 well as other documentation, but including a PET scan showing

12 that he has an abnormally shrinking brain, and that this is a

13 condition that has gone on for a long time.

14   But we've taken what the Government said, reviewed it

15 carefully; and we're not in a position to say that we believe

16 that the records we have meet that standard. So we would

17 withdraw that particular motion.

18     **THE COURT:** All right. And just to -- I think you

19 said this to me earlier, but let me just confirm it. You have

20 not had any difficulties talking with your client; he's been

21 able to assist in his defense; he understands what he's charged

22 with and the elements and the penalties for the crimes. Have

23 you had any concerns about competence?

24     **MR. ABRAMS:** No, Your Honor, we don't have any

25 concerns with competence; and to the extent that this issue

1 becomes relevant to anything down the road, of course, we'll
2 provide all the records to the Government and to the Court.
3 But we don't at all anticipate a competency issue, have
4 experienced nothing that would give us reason to believe that
5 that would -- will become an issue at this proceeding.
6        **THE COURT:** All right. Thank you.
7        **MR. ABRAMS:** Your Honor, just -- if I may, on the
8 *Brady* issue just point back to the *Saffarinia* case, which is a
9 Judge Sullivan opinion, I think it -- from our perspective, it
10 addresses the Government's responses to this -- to our motion;
11 and, you know, he kind of goes through and weighs the issues
12 and the open file -- the response we've given in open file, and
13 additional context to where we are and why we think that it's
14 reasonable to ask the Government to do this.
15        You know, this investigation has been going on for five or
16 six years, and so we think that it's not unreasonable that
17 within that time the Government has had an opportunity to
18 review what they've had and figure out, you know, well, some of
19 this stuff is exculpatory.
20        **THE COURT:** Okay. So going forward, generally
21 speaking, one lawyer per issue. You don't get two rebuttal
22 arguments, and at trial I will expect only one lawyer to speak
23 as to a witness. So, you know, if you're examining or
24 cross-examining, you're also the one objecting. That's it
25 because I can't have bunches of people popping up and

1  speaking -- you know, speaking over each other or trying to add
2  additional points.
3        **MR. ABRAMS:**  I apologize, Your Honor.
4        **THE COURT:**  No, that's okay.  I'm glad for the
5  opportunity to tell you my expectations.
6      And I used to not say this, but something happened now I
7  always say it.  If you're going to make the closing argument,
8  you need to be in the courtroom for the entire trial when
9  evidence is presented to the jury because I don't actually know
10 how you can make a closing argument if you haven't heard all
11 the evidence, and -- so I appreciate that sometimes cocounsel
12 may need to step out to deal with logistical matters or
13 whatever, but, you know, whoever is going to make the closing
14 argument, you need to be in here.
15     And I'm assuming -- I mean, usually the Government has a
16 paralegal or somebody who manages the document stuff, and a lot
17 of times, you know, they just manage it for the Defendant too.
18 So y'all should confer about that, as to whether you're going
19 to use the same system or -- you know, you've got some time to
20 work that out.  The one I had a couple weeks ago involved DOJ
21 tax lawyers, and they brought somebody with them.
22        **MR. CHUT:**  And, Your Honor, unless my colleagues
23 instruct otherwise, since I'm going to actually be in the
24 trial, I think we'll try to use our person, Your Honor.
25        **THE COURT:**  Yeah, that's fine.  That's great.  Just

1  coordinate that because it's a lot easier.

2      We'll have monitors up on all the tables and at the witness

3  stand and such, great big old monitors for the jury.  So -- all

4  right.

5      Now, there are several other pending motions, but I

6  didn't -- and let me just look back through my questions to be

7  sure we've covered everything.

8      I think this one kind of has gone by the wayside.  You

9  know, I was kind of unclear about this production in April of

10  2018 because it -- it was -- a couple places it was called a

11  voluntary production.  There were some other places it sort of

12  sounded like it was in response to a grand jury summons.  I'm

13  not sure I really need to know that anymore, unless you can

14  easily clarify it for me just for my own information.

15      **MR. TYNAN:**  I can certainly provide information,

16  Your Honor.  My understanding is that in February of 2018 there

17  was a grand jury subpoena to the Defendant's companies,

18  Forefront entities.  In the intervening periods, there were

19  conversations with the prosecutors at the time and the defense

20  about copying servers and making sure that information was

21  preserved; and then there were the search warrants executed at

22  the residence, as well as the business; and then after that

23  point in time the -- many of the devices which I believe were

24  expected to be found at the premises were not actually there,

25  and so counsel for Forefront produced those devices to the

1 Government.

2    I believe that's the timeline, and I'm reconstructing this

3 a little bit. My understanding was at the time it could have

4 been considered a voluntary production, but the Government went

5 ahead and got another warrant anyway. So I hesitate to say

6 that it was entirely voluntary when the Government went ahead

7 and -- felt it was necessary to get another warrant in May. So

8 that is the timeline from our view.

9         **THE COURT:** Well, I'm not sure I actually need to know

10 it in view of how things have kind of shaken out, but is there

11 any -- I know some of y'all were apparently involved around

12 that time period.

13    Anything you want to add to what the prosecutor said? I

14 take it you were representing Forefront at the time; is that

15 correct?

16         **MR. TOPETZES:** Mindful of the Court's admonition, I'll

17 defer to Mr. Kornobis.

18         **THE COURT:** Okay.

19         **MR. KORNOBIS:** Yes, Your Honor, we were representing

20 the Forefront companies, as well as Mr. Reifler personally at

21 that time.

22    The timeline that Mr. Tynan described is generally correct.

23 The -- some devices had been removed as part of -- basically,

24 as part of our ongoing discussions with the Government, near

25 daily at the time, regarding the devices and the Government's

1  instruction that we get them copied.  And in terms of the

2  production, that was also at the request of the Government, the

3  same day that the warrant was executed and then speaking again

4  over the course of that weekend.

5     So it was devices that would have been subject to the

6  search warrant and seizure warrant because they would have been

7  located at the premises and would fit within the criteria of

8  the search warrant but for the removal for purposes of making

9  forensic copies as part of the ongoing discussions with the

10  Government's -- very active and very cooperative with the

11  Government at that time.

12     The devices -- I believe the warrant was executed on

13  April 13th.  We had a conversation with the Government that day

14  about getting those documents -- getting the devices that had

15  been removed to the Government.  The Government asked that we

16  arrange that quite promptly, spoke over the weekend -- I think

17  it was on that Sunday -- and then the devices had started to

18  then be delivered to the Government or picked up by the postal

19  inspector starting that Monday and I think continuing over

20  several days based on logistics.

21         **THE COURT:**  Okay.  Well, thank you for -- I just

22  got -- when I saw "pursuant to grand jury summons" and then I

23  saw "voluntary," I was like, well, both of those can't be

24  right, though I guess in some ways maybe they both are right.

25  In any event, it's not particularly important at this point.

1      Now, I think that I covered -- I think I covered all of my

2  questions; and as to the remaining motions, I didn't have any

3  questions.  If there's any particular one that anyone

4  particularly wanted to speak to, you know, we can take a few

5  minutes.

6      Mr. Abrams, anybody on your -- since they're your

7  motions -- I mean, there was a lot of overlap.

8          **MR. ABRAMS:**  There was a lot of overlap, Your Honor.

9  We were really trying to meet the deadline for pretrial motions

10 and got -- and making sure we covered our bases.  So thank you

11 for taking so much time to dig into them.

12     The questions have been really helpful to allow us to

13 prepare to try to be helpful to you.  We really appreciate all

14 the time that's gone into preparing, and I don't think we have

15 anything else on the motions that we haven't covered.

16         **THE COURT:**  All right.  What about the Government?

17 Anything you needed to add that I might not have thought about?

18         **MR. TYNAN:**  No, Your Honor, the Government is

19 comfortable relying on its papers.

20         **THE COURT:**  Okay.

21     (Pause in the proceedings.)

22         **THE COURT:**  Hold on.  The clerk is reminding me -- at

23 one point I had some questions for her, so let me just look and

24 see if I answered them and got straight on that or if I need to

25 ask y'all.

1    (Pause in the proceedings.)

2        **THE COURT:**  Okay.  I'm good.  So I think I'm actually

3  going to be able to take care of most of this today, if not

4  all.

5    On the motion to dismiss Counts One through Four for

6  failure to state an offense and unconstitutional vagueness or

7  in the alternative for a Bill of Particulars —— that's on the

8  docket at 25 —— I'm going to deny that.

9    I think —— I appreciate the Defendant's arguments, but, you

10  know, we're really limited to what the indictment says, and,

11  you know, we read it in a fairly nontechnical way:  Does it

12  cover the elements; does it advise the Defendant of the charges

13  against him.  And a lot of what's going on here is, you know, a

14  disagreement about the facts and —— and then what the

15  Government's evidence is going to show.

16    You know, it's going to —— I'm going to have to assume

17  there will be motions to dismiss at the close of the

18  Government's evidence, and then I will have a concrete dispute

19  based on actual evidence in front of me, and it seems like

20  that's the better time to address it.  But, generally speaking,

21  it seems to me the indictment does allege a scheme to defraud

22  to obtain money using the wires to further that scheme.  It

23  identifies misrepresentations, and I'm not sure I really buy

24  the Defendant's argument that you have to have the

25  misrepresentation immediately before or contemporaneous with

1 when in this kind of situation it all seems to kind of go like

2 that and –– I'm losing my word for ––

3      **MR. ABRAMS:**  Interlocking.

4      **THE COURT:**  Interlocking.

5   Thank you, Mr. Abrams.

6   You know, it all just seems to just kind of be all of a

7 piece.  And, of course, the jury may find there's no scheme to

8 defraud, and, you know, that really seems to be what we're

9 talking about here.

10   So I'm going to put –– deny it.  The indictment provides

11 substantial detail, and it does not seem vague.  So I think

12 we're –– I think we can go forward based on that indictment.

13   Kind of the same about the duplicity argument at docket ––

14 in the motion to dismiss at Docket 26.  A lot of that motion

15 was based on the same arguments; and, you know, the cases in

16 the Fourth Circuit at least say where a statute specifies

17 alternative ways in which an offense can be committed, the

18 indictment can allege those several ways in the conjunctive;

19 and, you know, I just don't see it as being duplicitous.

20   We've got the statute of limitations motion.  That's at

21 Docket 27.  Again, I think we're looking at factual issues, and

22 the Supreme Court said in *Lane* mailings occurring after receipt

23 are within the statute where the goods are obtained by fraud

24 and if they're designed to lull the victims into a false sense

25 of security, to summarize and not quote the entire relevant

1 part. And I do think *Pierce* is on point as well, the Fourth

2 Circuit case about the bingo parlor.

3     Now, you know, whether the goods were obtained by fraud,

4 again, we'll be talking about -- that's a factual issue, and

5 the jury will be able to evaluate that in light of all the

6 circumstances.

7     The interstate communication argument, Docket 28, the

8 motion to dismiss, that -- again, the Government is going to

9 have to prove that, and it seemed to me that it's in the -- it

10 was in the indictment. Reading the -- you know, reading the

11 indictment as a whole, you've got the interstate communication

12 element alleged appropriately supported.

13     For perjury -- I'm repeating myself, but it's the same

14 basis. That's the motion at Docket 29, again directed

15 toward -- the motion seems directed toward factual issues.

16 And, you know, I appreciate the Defendant's reading of the

17 indictment, but there were other provisions. So when you read

18 it as a whole, it is not ambiguous or duplicitous.

19     The motion for disclosure of legal instructions provided to

20 the grand jury, you know, that -- I do think that requires a

21 strong showing of particularized need. I can appreciate maybe

22 the instructions -- maybe the burden is a little less than

23 that, but it still needs to be pretty high, and I don't think

24 we have a showing of that here. I'm really not persuaded that

25 on the circumstances of this case that -- of the legal point

1   about when the misrepresentation has to occur, the timing of it

2   as long as you generally have that causation connection.  So --

3   and then, you know, I did review the in camera submission from

4   the Government, and so in the alternative, I find that

5   disclosure would not be productive.

6       And as to whether the jury will get a copy of the

7   indictment, we'll take that up at trial.  So that's Docket 34,

8   and it's denied without prejudice.

9       The motion about disclosure of the legal instructions to

10  the grand jury -- that's the motion at Docket 33 -- that's

11  denied.

12      Docket 34, the motion to compel the Government to identify

13  the materials it will use in its case in chief and the

14  materials it will not use, that's been withdrawn.  So it's --

15  the clerk can mark it as withdrawn, and I don't have to rule on

16  it.  Ms. Winchester is nodding that she's got that.

17      The pre-indictment delay motion, also withdrawn.  That's

18  Docket 30.  So that is withdrawn.

19      The motion to suppress has been denied as moot.  That was

20  Docket 31.  I already did that.

21      I believe that leaves only the motion -- the *Brady* motion

22  at Docket 32.

23      Have I forgotten anything?  Covered everything?  Okay.

24      So let me just turn to that one.  I don't know when I read

25  *Brady versus Maryland* last, but I read it again in connection

1  with this, and it actually speaks in terms of the Government

2  suppressing evidence.  You can put disclosed or related —— they

3  just don't show up in *Brady*.  It talks about suppression.

4      And then when you get to some of the other Supreme Court

5  cases —— I looked at *Kyles,* K-y-l-e-s, from 1995, and it talks

6  about *Brady* and its progeny in terms of the prosecution's

7  affirmative duty to disclose evidence favorable to a defendant.

8  So, you know, the Supreme Court at least generally talks about

9  it in terms of suppression and disclosure.

10      Well, there's nothing to indicate we've got any suppression

11  here and, in fact, to the contrary.  The Government has

12  produced everything and —— and we have disclosure of everything

13  the Government has, you know, either that it —— it has

14  directly, the prosecution team has, or, you know, the rest of

15  it they have made available to the Defendant that has

16  potentially privileged matters which also might contain

17  exculpatory material.  So that's available.

18      And, you know, generally the Circuit Courts have been

19  pretty suspicious about this kind of request.  We don't have a

20  published opinion from the Fourth Circuit; but the Fifth, the

21  Seventh, and the Sixth have been, I think it's fair to say,

22  suspicious; not exactly our facts.

23      But when we look at this case, the Government has provided

24  open-file discovery; and their productions, while voluminous,

25  have been well organized, numbered, indexed, searchable.  You

1  know, a lot of it is the Defendant's own documents, you know,
2  back to him, which he at least had access to until April of
3  2018.
4      Now, you know, I appreciate he wasn't charged with criminal
5  charges then, so the world has a different landscape, but
6  that's not a huge factor.  But he did have reason, certainly,
7  to be looking at his own materials then since there was a civil
8  lawsuit and an SEC investigation and it looks like a very
9  interesting bankruptcy proceeding.
10      So when -- but I think the main fact here that persuades me
11  not to require the Government to do any more than it has is
12  that they provide their -- provided their materials in a
13  searchable format and, at least as to the two million documents
14  that the Government has seen, the prosecution team has seen,
15  they're indexed, they're numbered, they're organized and
16  available.  There's no indication the Government was padding
17  the discovery or concealing *Brady* materials in a large volume
18  of information, and I think that they have met -- based on what
19  I know now, they have met their *Brady* obligations.  So that is
20  denied.
21      Now, I'm not going to write you any opinions because, you
22  know, it doesn't seem productive, and everything is going to
23  get narrowed down.  Y'all are going to continue to focus.
24  We'll take care of any disputes about the facts, or the jury
25  will, at the trial; and to the extent there's remaining

1  questions about the law, I'll be taking care of those in the

2  jury instructions.

3     It is -- I probably will run my -- it is my practice to --

4  after the jury is selected and impaneled to give them

5  preliminary instructions on the law, but they're usually not

6  very specific.  So, you know, they say the elements of wire

7  fraud are and then -- I'll have to figure out exactly how to do

8  it here, but they're shorter than the final instructions and

9  usually less specific.

10    So when y'all are giving me your proposed jury

11  instructions, if you want to submit proposed preliminary

12  instructions just on the law -- I'm not ask -- I know how to

13  instruct a jury at the beginning of the case, but, you know,

14  just on the part about the elements of this case, you know,

15  because I do like to tell them, "The Government has to prove

16  beyond a reasonable doubt as to the wire fraud counts the

17  following," however many elements I decide to break it up in,

18  "four things" -- one, two, three -- three things, two things,

19  whatever.

20    So, you know, if you want to do that, I'm open to it, but

21  it does need to be fairly short because I don't want to get

22  into -- I like to let them know what to be listening for.  If

23  there's going to be a statute of limitations issue, I'd like to

24  explain that to them at least briefly, you know.  So you're

25  welcome to do that.  If you don't do it, that's fine too.

1    And any -- and we can discuss trial housekeeping and

2  logistics at the final pretrial conference, unless there's

3  something y'all want to talk about now.

4          **MR. TYNAN:**  Nothing from the Government, Your Honor.

5          **MR. ABRAMS:**  Your Honor, I think the only issue, from

6  our perspective, is -- I'm saying this because I want to make

7  sure I'm preparing appropriately.  I'm -- sitting here right

8  now, we intend to rely on these five buckets that the

9  Government has outlined as being what we're defending against,

10 and that's -- so to the extent that -- you know, I don't know

11 that any -- I guess I just want that on the record because I

12 don't want to end up at trial and have prepared for the wrong

13 things.  I don't know that anything needs to be done beyond

14 them making a representation that's what this case is about.  I

15 think typically --

16         **THE COURT:**  Well, you know, I don't think they're --

17 that you're -- I mean, they've offered a reverse proffer,

18 right?  They told me, right?  I don't know.  They've explained

19 their theory here to me -- to help me understand it today.

20 They're limited by the indictment.

21         **MR. ABRAMS:**  And that's, I think, why I'm raising it.

22 That's our concern a little bit.  It seems like we've heard a

23 couple -- and I'm not trying to -- I understand the Court's

24 ruling.  I'm not trying to reargue it.  I'm really just trying

25 to make sure I can prepare.  We've now gone through with some

1  more specificity, which is really what we were seeking, about

2  what it is we're responding to, and I don't want to assume --

3        **THE COURT:**  Well, I don't know what you want me to do

4  about that.  I mean, they've said what they said.  The

5  indictment says what it says.  I'm -- if you're asking me to do

6  something, I don't know what you're asking me to do.

7        **MR. ABRAMS:**  Yeah.  I guess -- maybe I'll talk with

8  the Government about that.  If they say that they're going to

9  change courses, then we'll raise it with Your Honor.

10        **THE COURT:**  Okay.  All right.

11      Anything else?

12        **MR. ABRAMS:**  Not for Mr. Reifler, Your Honor.  Thank

13  you.

14        **MR. TYNAN:**  No, Your Honor.  Nothing from the

15  Government.  Thank you.

16        **THE COURT:**  All right.  Well, it looks like then I

17  will not see y'all until February or so, late January; and if

18  you need me before then, you can file something or get in touch

19  with the courtroom clerk, Ms. Winchester here; and I will get

20  you on the schedule should anything arise that requires my

21  attention.

22      Court is adjourned.

23      (Proceedings concluded at 2:27 p.m.)

24

25

1

**C E R T I F I C A T E**

2

    I, LORI RUSSELL, RMR, CRR, United States District Court
Reporter for the Middle District of North Carolina, DO HEREBY

3

CERTIFY:

4

    That the foregoing is a true and correct transcript of the
proceedings had in the within-entitled action; that I reported

5

the same in stenotype to the best of my ability and thereafter
reduced same to typewriting through the use of Computer-Aided

6

Transcription.

7

8

9

Lori Russell, RMR, CRR      Date:  12/28/21

10

Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25